[No. 21597-1-III.   Division Three.   March 25, 2004.]

THE STATE OF WASHINGTON, *Appellant*, v. ALEXANDER MARTINEZ, *Respondent*.

22

*Ronald S. Zirkle*, *Prosecuting Attorney*, and *Kenneth L. Ramm, Jr.*, *Deputy*, for appellant.

*Lenell R. Nussbaum*, for respondent.

SCHULTHEIS, J. — Pursuant to CrR 8.3(b), the trial court may dismiss a criminal prosecution when governmental misconduct prejudices the accused's right to a fair trial. Alexander Martinez was charged as an accomplice to first

degree assault and a number of other crimes. During trial, the State revealed evidence of an exculpatory nature that the defense claimed it had never received. The jury voted 10 to 2 to acquit and the trial court declared a mistrial. When the State then refiled charges, defense counsel moved to dismiss on the basis of CrR 8.3(b) and double jeopardy grounds. The trial court heard testimony from various witnesses, reviewed the record from the previous trial, and dismissed.

On appeal, the State contends Mr. Martinez failed to prove either governmental misconduct or prejudice sufficient to justify dismissal under CrR 8.3(b). We find that the State's withholding of exculpatory evidence was misconduct so egregious that it violated principles of fundamental fairness, and affirm.

FACTS

Mr. Martinez worked as the human resources manager at Washington Fruit in Yakima. The sales manager at Washington Fruit was Thomas Hanses, Sr. On March 20, 2001, just before 6 A.M., Mr. Hanses was robbed at gunpoint in his home. Two men bound Mr. Hanses and told him that someone at work wanted them to kill him. Although the robbers decided not to kill Mr. Hanses, they stole money and other items and then drove away in his Yukon Denali. Mr. Hanses reported the crime and police soon tracked the Yukon by way of its OnStar feature. Within a short time, brothers Noe and Manuel Caldera were arrested and gave statements implicating Mr. Martinez as the " 'master-mind' of the operation." Clerk's Papers (CP) at 53. They stated that Mr. Martinez gave them guns, showed them where Mr. Hanses lived, gave them the locked gate code to Mr. Hanses's property, told them Mr. Hanses's wife was out of town, and told them March 20 would be a good time to rob and kill him. Officers found two handguns—a black one and a silver one—that the Calderas claimed Mr. Martinez gave them in early March to use against Mr. Hanses.

Mr. Martinez was arrested before noon that same day and charged with accomplice to first degree assault (RCW 9A.36.011(1)(a); RCW 9A.08.020); accomplice to first degree burglary (RCW 9A.52.020(1)(a); RCW 9A.08.020); accomplice to first degree kidnapping (RCW 9A.40.020(1)(b), (d); RCW 9A.08.020); and accomplice to first degree robbery (RCW 9A.56.190; former RCW 9A.56.200(1)(a) (1975); RCW 9A.08.020). Later that summer, the Calderas entered into plea agreements wherein they agreed to testify against Mr. Martinez in return for favorable sentencing recommendations.

On the same day as the robbery, Deputy Robert Weedin of the Yakima County sheriff's department traced the serial number found on the silver gun confiscated from the Calderas.[1] He discovered that the gun had been owned by Roberto Ramirez of Wapato and had been reported stolen on October 31, 2000. Defense counsel has no record that the report of the Ramirez burglary was ever received from the State. Deputy Weedin told Yakima prosecutor Jeff Sullivan about the Ramirez burglary report within days, but did not mention the report in any of his case reports.

On March 30, 2001, Deputy Weedin interviewed Rebecca Reinmuth, who had worked as a receptionist at Washington Fruit from May 1999 to May 2001. She told him Mr. Martinez had showed her two guns, one black and one silver, that he offered to sell her as a Christmas present. Later, when she attended a gun lineup, she picked out the black and silver guns recovered from the Calderas. Although she was not sure at first whether Mr. Martinez showed her the guns in December 1999 or December 2000, by the time of a November 15, 2001 hearing to suppress the results of the gun lineup, she was firm that he showed her the guns around December 1999. Consequently, the State knew at least by mid-November 2001 that the silver gun identified by Ms. Reinmuth could not have been the same gun shown to her by Mr. Martinez in December 1999

---

[1] The serial number on the black gun had been removed and its ownership could never be traced.

because the gun identified by her was owned by Mr. Ramirez until October 2000.

In Mr. Sullivan's opening statement at trial in January 2002, he described Ms. Reinmuth's identification of the guns at the gun lineup:

> She will tell you that the defendant tried to sell her two guns. . . .
>
> You will also hear the Calderas tell you that Mr. Martinez gave them the two guns that they used, those guns will be here, because we seized them that morning, because they got caught so fast. You will also hear Rebecca Reinmuth describe for you how she looked at four black guns and picked out the black Glock that we seized from the Calderas. She will explain to you that she looked at three silver guns and picked out the silver gun. Now she can't tell you that these are the same guns, I think she will say that they just looked the same. As I say, Manuel and Noe Caldera will tell you that Mr. Martinez gave him, gave them those guns.

Report of Proceedings (RP) at 222.

After two weeks of testimony by the State's witnesses, Mr. Sullivan told defense counsel, Adam Moore, that he was not going to question Ms. Reinmuth regarding the gun lineup. When asked why, Mr. Sullivan stated that there was still confusion about whether she saw the guns in 1999 or 2000. Mr. Moore could not understand why this information was relevant. Suspicious something was amiss, he decided to interview Ms. Reinmuth the next morning before trial started. The interview was not enlightening, so Mr. Moore asked Mr. Sullivan again why he was dropping the gun lineup. Mr. Sullivan replied that the gun was reported stolen in 2000. This further confused Mr. Moore, because the only gun theft he had in his records was the July 2000 theft of a gun owned by Mr. Martinez. He could not understand why the theft of Mr. Martinez's gun was relevant to Ms. Reinmuth's gun lineup.

Just before trial resumed that same day, Mr. Sullivan pulled out the Ramirez burglary report and showed it to Mr. Moore, but did not enter it into evidence. The prosecutor

then recalled Deputy Weedin for a few questions. Mr. Sullivan stated that he had forgotten to ask the deputy the day before whether the silver gun had been stolen from Mr. Ramirez on October 31, 2000. The defense claims this was the first occasion it heard of the Ramirez burglary. During Ms. Reinmuth's testimony, she stated that sometime in November or December 1999 Mr. Martinez showed her two guns. She was then asked to identify the two guns recovered from the Calderas. Although she stated that she could not be absolutely positive, she agreed that the guns looked like the ones Mr. Martinez had showed her and that she had identified earlier. The State rested by noon that day.

During presentation of the defense, Mr. Moore asked Ms. Reinmuth if she had clarified during the November 2001 court hearing on the motion to suppress the gun lineup that Mr. Martinez showed her the guns before Christmas of 1999. She replied, "Correct." RP at 2432.

Witnesses for the defense and cross-examination of the State's witnesses attacked the credibility of the Caldera brothers. Noe Caldera—an illegal alien—had worked at Washington Fruit for two months in 2000, but quit because he did not like his duties. The brothers gave contradictory accounts of the crime: one stated that they used the security code to enter the gate while the other said they walked through an unlocked pedestrian gate; one said they bought ski masks together at Wal-Mart while the other said Mr. Martinez provided the masks; and one said Mr. Martinez showed them what electrical straps to use on Mr. Hanses while the other said he found the straps at his house and suggested using them. The gate security code Noe Caldera claimed Mr. Martinez gave him was incorrect.

According to the Calderas, Mr. Martinez called them immediately after the robbery and warned them about the OnStar system on the Yukon. They also stated that he had called them the day before to discuss the robbery. Officers traced incoming calls to one of the brothers' cellular telephones and discovered that a call came in from a Safeway pay telephone on the morning of the robbery. Videotapes

from the area of the pay telephone were reviewed, Mr. Martinez did not appear, and the officers allowed the store to tape over the videotape. Officers were also told that Mr. Martinez had called the Calderas' home telephone, but the officers failed to retrieve the telephone's caller identification before it was recorded over.

Mr. Martinez testified that he had nothing to do with the robbery of Mr. Hanses. He stated that, as the only member of management who spoke Spanish, he often interpreted for managers when they disciplined Spanish-speaking employees. As a result, he was accused of selling out, of being "[a]n Oreo cookie, brown on the outside, white on the inside." RP at 2455. As for the two guns shown to Ms. Reinmuth, Mr. Martinez testified that he had sold the black one to a co-worker in the spring or summer of 2000, and that he had reported the silver one stolen in the summer of 2000. The co-worker verified the sale of the black gun, and the record of the police report on Mr. Martinez's stolen silver gun was admitted.

Incredibly, even after the revelation that the gun identified by Ms. Reinmuth could not have been the same gun used in the robbery, the State again tried to suggest a connection between them. During cross-examination of Mr. Martinez, Mr. Sullivan referred to the two guns showed to Ms. Reinmuth:

Q Okay. Now you showed her a black gun and a silver gun, right?

A Correct, sir.

Q Noe Caldera says you gave them a black gun and a silver gun, correct?

A That's what he says, sir.

Q And he was—they were—the brothers were arrested with a black gun and a silver gun, correct?

A Yes, they were, sir.

Q Just a terrible coincidence; isn't it?

A For me it is, sir.

RP at 2560.

The jury voted 10 to 2 to acquit Mr. Martinez. Because the jury was unable to reach a unanimous verdict, the trial court declared a mistrial on January 31, 2002. The State immediately filed an amended information charging Mr. Martinez with conspiracy to commit first degree murder (RCW 9A.32.030(1)(a); RCW 9A.28.040); first degree burglary (RCW 9A.52.020(1)(a); RCW 9A.08.020(3)); first degree kidnapping (RCW 9A.40.020(1)(b), (d); RCW 9A.08.020-(3)(a)); first degree robbery (RCW 9A.56.190; former RCW 9A.56.200(1)(b) (1975); RCW 9A.08.020(3)(a)); and first degree theft (RCW 9A.56.020(1)(a), .030(1)(a); RCW 9A.08.020). Citing *Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982), Mr. Martinez moved for dismissal of the charges, arguing that double jeopardy barred the second trial due to actions by the prosecutor that were intended to provoke a mistrial. He later amended this motion to additionally allege governmental misconduct justifying dismissal under CrR 8.3(b). After hearing the testimony of several witnesses and reviewing the record, the trial court granted Mr. Martinez's motion and dismissed on the basis of CrR 8.3(b).

## GOVERNMENTAL MISCONDUCT

The State contends the trial court erred in finding governmental misconduct and prejudice sufficient to justify CrR 8.3(b) dismissal of the new charges against Mr. Martinez. CrR 8.3(b) provides that

> [t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

To support dismissal under CrR 8.3(b), the defendant must show by a preponderance of the evidence both (1) arbitrary action or governmental misconduct, and (2) actual prejudice affecting the defendant's right to a fair trial. *State*

*v. Rohrich*, 149 Wn.2d 647, 654, 658, 71 P.3d 638 (2003); *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003). Claimed governmental misconduct need not be evil or dishonest in nature; " 'simple mismanagement is sufficient.' " *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997) (emphasis omitted) (quoting *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993)). However, dismissal under CrR 8.3(b) is an extraordinary remedy that is improper except in truly egregious cases of mismanagement or misconduct that materially prejudice the rights of the accused. *State v. Moen*, 150 Wn.2d 221, 226, 76 P.3d 721 (2003); *Wilson*, 149 Wn.2d at 9.

■ We review the trial court's decision on a CrR 8.3(b) motion to dismiss for manifest abuse of discretion. *Moen*, 150 Wn.2d at 226. Discretion is abused if the trial court's decision is manifestly unreasonable or is based on untenable grounds. *Rohrich*, 149 Wn.2d at 654. We will find a decision manifestly unreasonable "if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take.' " *Id.* (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990)). A decision is based on untenable grounds "if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *Id.* Even if we find abuse of discretion, we will affirm the trial court's CrR 8.3(b) dismissal of the charges if we find that the defendant proved sufficient grounds. *Id.* (citing *Michielli*, 132 Wn.2d at 242-43).

■ The State first contends the trial court erred in finding that the State withheld the Ramirez burglary report from the defense and in concluding that this conduct constituted governmental misconduct. We find substantial evidence to support the trial court's findings that the State did not send a copy of the report to the defense and that Deputy Weedin did not disclose the Ramirez burglary in any of his reports. Although Mr. Sullivan testified he believed his office sent defense counsel a copy of the Ramirez burglary report, he admitted he had no direct

knowledge of this. No one in his office could verify that the report was sent to the defense, and defense counsel insisted he had no knowledge of the report until the day it was showed to him just before the State rested. As evidence that the report was sent, the State cites an internal notation attached to the report in its files dated June 28, 2001: "rec'd all info. re glock .22 [the black gun] from jakes-no matches; sent info. re. previous owner of the colt [the silver gun]." Ex. K. However, the private investigator responsible for filing and documenting for the defense all materials sent from the State has no record of anything sent on or near that date. The trial court, after hearing testimony from these witnesses and reviewing the record of the prior trial, was "in a better position to assess the credibility of witnesses, take evidence, and observe the demeanor of those testifying." *State v. Hill*, 123 Wn.2d 641, 646, 870 P.2d 313 (1994). We will not disturb its determination of the facts.

For the first time on appeal, the State presents a document it discovered in the court files entitled "Stipulation & Order for Return or Destruction of Exhibits &/or Unopened Depositions." CP at 331. Stapled to the back of the stipulation and order is a copy of the history of both guns, including the stolen gun report on the silver gun. The State contends the presence of this document in the court files put the defense on notice of the Ramirez burglary report. Mr. Martinez responds that the fact that the State did not discover this document until appeal of the dismissal of the charges indicates this file was not reasonably discoverable. *See In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 396, 972 P.2d 1250 (1999) (there is no violation of the rule that the State must disclose exculpatory evidence if the defendant could have obtained the information using reasonable diligence). Defense counsel obtained an order from the commissioner of this court (dated January 12, 2004) authorizing supplementation of the record with depositions from the Yakima County deputy clerk, the trial judge, and additional witnesses. According to these depositions, the stipulation and order document was signed by the parties

and the judge before the gun reports were attached. The only reason the gun reports were attached was to acknowledge receipt of the guns from police custody. Such receipts usually were not attached to court documents and were required only for internal monitoring. It is apparent that the stolen gun report attached to the stipulation and order was not readily discoverable even by the State and therefore did not satisfy the State's duty to disclose exculpatory evidence.

The trial court's conclusion that the State committed misconduct by failing to send defense counsel the Ramirez burglary report was based on the rule adopted from *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which requires the State to disclose material exculpatory evidence. Evidence is material if there is a reasonable probability that, if it had been disclosed to the defense, the result of the proceedings would have been different. *Gentry*, 137 Wn.2d at 396. In determining whether the Ramirez burglary report was material and exculpatory, we ask whether Mr. Martinez would have received a fair trial without it. *Id.* The burglary report established that Ms. Reinmuth could not have seen the silver gun used by the Calderas and therefore could not have accurately identified that gun at the gun lineup. It is clear that Mr. Martinez would not have had a fair trial if the report had not been revealed.

The fact that the report was revealed just before the State rested its case did little to diminish the prejudicial effect of surprising the defense with it at such a late date. Mr. Sullivan insisted the "issue" of the burglary report did not arise until the middle of trial, when Ms. Reinmuth "finally decided" Mr. Martinez showed her the guns in December 1999. RP at 3203. This admission suggests that the State withheld the information in the hope that Ms. Reinmuth would remember differently and remove the exculpatory effect of the report. In the context of Mr. Sullivan's admission that he learned of the burglary report at least by June 2001, and Ms. Reinmuth's firm statement in the November

2001 suppression hearing that she saw the guns in 1999, Mr. Sullivan's insistence that he did not know the significance of the Ramirez burglary report until the middle of trial is ludicrous. Further, the potential exculpatory nature of the report was obvious from the time of Ms. Reinmuth's statement—made at least by October 2001—mentioning that Mr. Martinez showed her the guns in either December 1999 or 2000.

At any rate, the State's silence regarding the Ramirez burglary during the suppression hearing in November 2001 is particularly troubling. Arguing for the gun lineup's admission, Mr. Sullivan told the court that the results of the gun lineup were "damning" (RP at 126) because the Caldera brothers had said from the start that Mr. Martinez gave them the guns identified by Ms. Reinmuth. The relevance of this testimony is severely limited by information that the silver gun identified by Ms. Reinmuth could not have been the same silver gun shown to her by Mr. Martinez in December 1999. Recognizing this fact, the trial court concluded that

> Sullivan's omission misled the trial judge into making a ruling that never questioned the materiality or relevancy of the gun identification. . . . In fact, the chrome gun could not have been the same gun used by the Calderas. Had the court known this, the evidence would have been inadmissible pursuant to Evidence Rule 402, which provides that evidence . . . which is not relevant is not admissible.

CP at 67. This conclusion is supported by the evidence and is neither manifestly unreasonable nor based on untenable grounds.

Deferring to the trial court's superior position as the trier of fact, we find sufficient evidence that the State knew of the Ramirez burglary report from the beginning of the investigation and knew at least two months before trial that Ms. Reinmuth could not have identified the same gun shown to her by Mr. Martinez. Yet the State did not inform the trial court or the defense until just before it rested its case. The State's failure to reveal exculpatory evidence to the accused

is a violation of due process. *Gentry*, 137 Wn.2d at 396. Consequently, the trial court did not abuse its discretion in concluding that the untimely revelation of exculpatory evidence here constituted governmental misconduct. Even if this misconduct is the result of mismanagement rather than deceit, it is egregious enough to satisfy the first requirement for a CrR 8.3(b) dismissal. *Moen*, 150 Wn.2d at 226.

That leaves the question of prejudice affecting Mr. Martinez's right to a fair trial. *Rohrich*, 149 Wn.2d at 658. The trial court summarized the arguments of the parties in its conclusions of law as follows:

9. The deputy prosecuting attorney who took over the case from Sullivan, argues that even if all of the above is true there is no prejudice to the defendant. Martinez was not convicted. He is entitled to a new trial based upon the jury's inability to reach a verdict in the first trial. This time the defense will have the missing report. He also asserts that the fact that Martinez did not request a continuance or mistrial when the burglary report came to light illustrates that there was no prejudice in the first trial anyway.

10. A continuance in the middle of the trial would not have remedied the problem. The trial was tainted from the opening statement. Moving for a mistrial would have made it nearly impossible for the defense to succeed with a subsequent argument that retrial would be barred by the double jeopardy clause of the Constitution. This is because the only way the defendant can prevail on a double jeopardy argument when the defendant requests the mistrial is if the defendant can show the prosecutor's misconduct was for the purpose of making the defense ask for a mistrial, a nearly impossible thing to prove.

CP at 68-69. The court additionally found prejudice in the deprivation of Mr. Martinez's right to counsel (because "late discovery compromised defense counsel's ability to adequately prepare for trial") and to effective assistance of counsel (because suppression of critical evidence hindered

Mr. Moore's ability to defend). CP at 69. We find the trial court's conclusions compelling.

▮ Government conduct may be so outrageous that it exceeds the bounds of fundamental fairness, violates due process, and bars a subsequent prosecution. *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1999); *State v. Lively*, 130 Wn.2d 1, 18, 921 P.2d 1035 (1996). The level of governmental misconduct needed to prove a violation of due process must shock the conscience of the court and the universal sense of fairness. *Hunt*, 171 F.3d at 1195; *Lively*, 130 Wn.2d at 19.

Most cases of outrageous government conduct involve police misconduct in the investigation of criminal activity. *See, e.g., cases cited in Lively*, 130 Wn.2d at 21. In *Lively*, for example, a police informant attended Alcoholics Anonymous (AA) meetings to befriend a woman who was a recovering addict, woo her, and convince her to arrange drug sales to him through her former underworld contacts. The Washington Supreme Court found that attending AA meetings to lure recovering drug addicts to commit illegal acts was repugnant to a sense of justice. *Lively*, 130 Wn.2d at 26.

▮ The State prosecutor's withholding of exculpatory evidence until the middle of a criminal jury trial is likewise so repugnant to principles of fundamental fairness that it constitutes a violation of due process. As declared by Justice Brandeis in his dissent to *Olmstead v. United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting),

> [d]ecency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.

In the drive to achieve successful prosecutions, the end cannot justify the means. *Id*. And if the State knows that

the most severe consequence that can follow from withholding exculpatory evidence until late in the trial is that it may have to try the case twice, it will hardly be seriously deterred from such conduct in the future. *See State v. Cory*, 62 Wn.2d 371, 377, 382 P.2d 1019 (1963) (affirming dismissal of charges due to police eavesdropping upon private consultations between a defendant and his attorney).

As the trial court concluded, "[p]reservation of the integrity of conviction is at a minimum as important as securing the conviction itself." CP at 70. The trial court decided that there was no appropriate lesser sanction than dismissal of the charges in this case: "In fact without dismissal there is no remedy at all." CP at 71. Mr. Martinez spent a year in confinement and exhausted his financial resources defending himself in a trial "tainted from the opening statement." CP at 69. If he had moved for mistrial when the stolen gun report was revealed, he could not have argued that retrial would be barred by double jeopardy unless he could have proved that the State *intended* to provoke a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 673-74, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982); *State v. Juarez*, 115 Wn. App. 881, 888, 64 P.3d 83 (2003). As the trial court noted, this would be a nearly impossible thing to prove. We find no abuse of discretion.

Affirmed.

KATO, A.C.J., and SWEENEY, J., concur.

Reconsideration granted and opinion amended April 20, 2004.