# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47011-0-II |
| Respondent, | |
| v. | |
| MICHAEL JOHN PIERCE, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Michael John Pierce appeals his jury trial convictions for two counts of first degree murder and one count each of first degree robbery, burglary, and arson, theft of a firearm and second degree possession of a firearm, and second degree theft of a debit card. He asserts that the trial court erred during his third trial when it ordered retrial rather than dismissal of the charges. Pierce further argues that in his fourth trial, the trial court erred when it denied his motion for a mistrial, allowed improper evidence, and rejected his proposed cautionary jury instruction. Pierce argues also that cumulative error requires reversal of his convictions. Because we conclude that there is no reversible error, we affirm Pierce's convictions.

FACTS

I. BACKGROUND FACTS

In March 2009, shortly after 8:00 PM, a caller reported a fire at the home of James Patrick and Janice Yarr in Jefferson County. Firefighters discovered the burned bodies of the Yarrs in the

remains of their home. The Yarrs had each been shot in the head sometime that evening with a .25-06 caliber rifle. Investigators concluded that an intruder had murdered the Yarrs and set fire to their bodies around 7:30 PM.

At 8:11 PM, Pierce used the Yarrs' debit card to withdraw money from an automatic teller machine (ATM). Police arrested Pierce, who initially denied using the debit card or being involved in the murders. Pierce would admit after his arrest that he used the debit card, but he continued to deny involvement in the murders. Police discovered that Pierce had stolen a pellet gun from a hardware store near the Yarrs' home at about 6:30 PM, approximately an hour before the murders.

Pierce was arrested and charged with two counts of first degree murder and one count each of first degree robbery, burglary, and arson, theft of a .25-06 caliber firearm from the Yarrs' home and second degree possession of the firearm, and second degree theft of the debit card.

## II. PROCEDURAL FACTS

Pierce was convicted after four jury trials. In March 2010, at the first of Pierce's jury trials, the jury found him guilty of all charges. In July 2012, we reversed Pierce's convictions and remanded for a new trial.[1]

### A. PRETRIAL EVIDENTIARY RULINGS

In 2013, the Jefferson County Superior Court ruled on the parties' motions to exclude evidence of shoplifting the pellet gun, identification of Pierce using the Yarrs' ATM card, and reference to the procedural history of Pierce's case.

---

[1] *State v. Pierce*, 169 Wn. App. 533, 280 P.3d 1158 (2012).

The trial court denied Pierce's motion to exclude evidence that Pierce had stolen a pellet gun from a store on the evening of the murders. The trial court ruled that this evidence was admissible as both res gestae evidence and evidence of preparation and planning to commit the other crimes. As res gestae evidence, the pellet gun theft established Pierce's whereabouts on the night of the murders. And as evidence of planning and preparation, the theft showed that Pierce had a "simulated weapon that could be used to facilitate" a robbery. Clerk's Papers (CP) at 754. The trial court noted that Pierce was a convicted felon "who could not lawfully purchase a firearm." CP at 755. And there was little danger of prejudice from the theft of the pellet gun when the defendant was on trial for murder and arson.

The trial court also denied Pierce's motion to exclude the lay opinion testimony of Detective Mark Apeland under ER 701.[2] Detective Apeland had three or four prior personal contacts with Pierce. These included arresting Pierce in 2004 and 2005 and sitting across a small table from Pierce and conversing with him in 2008. Based on those contacts, Detective Apeland identified Pierce as the person shown in the ATM surveillance video using the Yarrs' debit card. The trial court concluded that Detective Apeland had sufficient prior personal contacts with Pierce for Apeland's testimony to be helpful to the jury. However, the trial court excluded lay opinion testimony of three other officers identifying Pierce because those officers did not have sufficient prior personal contacts with Pierce.

---

[2] ER 701 allows a lay witness to provide opinion testimony if the opinion is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."

The trial court granted Pierce's request that counsel and witnesses be prohibited from referring to Pierce's prior trial, although witnesses could say that they had testified at a "'prior hearing.'" CP at 658. The trial court also granted the State's request that defense counsel make no reference to the procedural history of Pierce's case.

### B. FIRST MISTRIAL

Pierce's second trial ended abruptly when a juror realized she had witnessed some of the events at issue. The trial court declared a mistrial and ordered the venue changed to Kitsap County.

### C. MEDICATION DISCONTINUED AND SECOND MISTRIAL

Pierce was transferred to the Kitsap County Jail. In late February 2014, Pierce's third trial began in Kitsap County Superior Court.

Pierce, who suffered from schizophrenia, took prescribed psychotropic medication to alleviate his symptoms. At the time of Pierce's transfer, Kitsap County Jail contracted with Conmed, a private business, to provide medical care to inmates. Conmed's policy continued prescribed psychotropic medications up to 14 days after a new inmate's arrival. If a continuation order would expire before a psychiatrist could see the new inmate, Conmed's policy required medical staff to obtain another continuation order. The continuation period for psychotropic medications was shorter than for other medications because Conmed wished to closely monitor and regularly reassess psychotropic medications.

Pursuant to its policy, Conmed continued Pierce's medication for 14 days from his intake. Conmed scheduled Pierce to see the jail psychiatrist on March 4, 2014, three days before the continuation would lapse. But Pierce was in court that day, and the psychiatrist did not meet with Pierce. Two days before the continuation would lapse, a nurse was asked to obtain another

4

continuation order. She failed to do so. The day the continuation lapsed, another nurse gave Pierce his last dose of medication. That nurse failed to notice that the medication would lapse and did not obtain an extension. Pierce did not receive medication from March 8 to 10.

On March 10, Pierce sat through a full day of his third trial before the trial court was notified that Pierce had not received his medications. On March 21, the trial court conducted a competency hearing. Following the hearing, the trial court declared a mistrial based upon manifest necessity because Pierce had been rendered involuntarily absent by Conmed's failure to give Pierce his prescribed medication. The trial court concluded that Pierce's rights to "a fair trial, due process, and confrontation" had been violated. CP at 972. Nothing short of a new trial, in the trial court's view, would remedy the prejudice. Thus, Pierce's third trial ended in a mistrial.

Before Pierce's third trial, which lasted from February 24, 2014 until March 24, 2014,[3] he had waived his right to a speedy trial through May 31, 2014. After the third trial ended in a mistrial, Pierce extended the waiver through October 31, 2014. Pierce did so because he sought to have additional time to prepare a motion to dismiss the charges against him with prejudice and because a new trial would not be necessary if his motion was successful.

D. PIERCE'S MOTION TO DISMISS FOR MEDICATION DISCONTINUATION

Pierce moved under CrR 8.3(b) to dismiss with prejudice the charges against him.[4] He argued that the negligence amounted to governmental misconduct and that Conmed's continuation policy was "'arbitrary action.'" CP at 990. He argued also that the governmental misconduct and

---

[3] This period includes a week-long recess beginning on March 12.

[4] CrR 8.3(b) authorizes dismissal with prejudice if a defendant shows (1) either arbitrary action or governmental misconduct and (2) prejudice affecting the defendant's right to a fair trial.

arbitrary action prejudiced Pierce because his right to a fair trial was "[c]ompletely [a]brogat[ed]." CP at 992. Pierce claimed that the misconduct prejudiced him because he had been forced to waive speedy trial to allow counsel time to adequately investigate and brief his CrR 8.3(b) motion. Pierce contended that he was improperly forced to choose between his right to a speedy trial and his right to have counsel adequately prepare the dismissal motion. Pierce further argued that because the government's misconduct was "shocking" and "outrageous," the due process violation mandated dismissal of the charges with prejudice. CP at 994.

The trial court refused to dismiss the charges because it determined that there had been no governmental misconduct, arbitrary action, or prejudice to Pierce's fair trial right that could not be cured by a new trial. Further, the trial court concluded that any prejudice was alleviated when the trial court granted a mistrial. In particular, the trial court rejected Pierce's speedy trial argument. The trial court reasoned that the speedy trial waiver in place at the time of the second mistrial had been extended solely to file the motion to dismiss. The trial court noted that Pierce suffered no prejudice to his new trial because he was merely "inconvenienced" by the new trial. CP at 1465. And the trial court concluded that while there had been a due process violation, a new trial, not a dismissal with prejudice, was the appropriate remedy because the State's conduct was not "'outrageous.'" CP at 1474

III. FOURTH TRIAL AND CONVICTION

A. EVIDENCE PRESENTED

In October 2014, Pierce's fourth trial began. The State called multiple witnesses. The Yarrs' daughters testified that their parents kept firearms in their home, including a rifle that the Yarrs kept openly in the kitchen.

6

A cashier from a hardware store testified that Pierce had come into the store around 6:30 PM on the night of the murders and asked if the store sold pellet guns. Pierce stole a pellet gun from the hardware store, and the cashier watched as Pierce drove away in a white Honda. It was about 22 minutes from the hardware store to the Yarrs' home.

Two witnesses testified that they had seen a man matching Pierce's description walking down the side of Highway 101 near the Yarrs' home that evening, around 7:45 PM. One of the witnesses had also seen a small, white car farther down the road.

Travelers along Highway 101 that night testified that they had seen a fire at the Yarrs' residence around 8:00 PM. Firefighters arrived at the home and extinguished the flames. In the remains of the Yarrs' kitchen, firefighters discovered the Yarrs' bodies. Based on evidence of gunshot wounds to the Yarrs' heads, spent rifle casings, including those of a .25-06 caliber rifle, and the odor of gasoline at the scene, investigators concluded that someone had murdered the Yarrs and set a fire to conceal the crime. An arson investigator later concluded that someone had poured gasoline over the Yarrs' bodies and ignited it around 7:30 PM that evening.

The State showed the jury photographs taken at 8:11 PM of Pierce using the Yarrs' debit card to withdraw cash from an ATM. The ATM was located about seven miles away from the Yarrs' home. Although the man shown in the ATM surveillance photos had his shirt pulled over his face, Detective Apeland recognized him as Pierce, whom Apeland had contact with several times before. Two other people who had met Pierce also testified that they recognized Pierce as the man in the photographs. The Yarrs' banker testified that the Yarrs always kept their debit card at home and did not use it.

An acquaintance of Pierce testified that on the night of the murders, Pierce showed up at a mutual friend's home. Pierce was wearing new-looking clothes and appeared "all cleaned up." 9 Report of Proceedings (RP) (Nov. 4, 2014) at 1559. He smelled of shampoo. Police later searched Pierce's girlfriend's car, a white Honda, and found a butcher block of knives. Both of the Yarrs' daughters identified the butcher block as belonging to their mother. Near Pierce's girlfriend's home, police also found large trash bags with a man's shirt and shoes, soaking wet, inside.

Two of Pierce's fellow inmates, Bradley Reynolds and Richmond Dhaenens, testified in return for plea agreements. Pierce told Reynolds, "I killed those two [the Yarrs]." 8 RP (Nov. 3, 2014) at 1313. Both Reynolds and Dhaenens testified that Pierce told them that he had gone to the Yarrs' house to "collect a debt" and that he had taken the butcher block. 8 RP (Nov. 3, 2014) at 1311.

After the State rested, the defense presented its witnesses. Investigators testified that they found no evidence of blood or gasoline on the clothes found in trash bags or the white Honda. Pierce's mother testified that she had given Pierce the knife block.

As argued in closing, Pierce's defense was that whoever had killed the Yarrs would have been covered in blood and gasoline. However, Pierce argued that there had been no evidence of blood or gasoline on Pierce, the clothes found in the trash bags, or the white Honda. Pierce further argued that the testimony linking Pierce to the murders was just that of jailhouse "snitches." 12 RP (Nov. 10, 2014) at 2186. Pierce argued that the only crime of which Pierce was guilty was the theft of the Yarrs' debit card. He conceded that the State had proved beyond a reasonable doubt that Pierce had used the Yarrs' debit card on the night of the murders.

B.  APPEAL TESTIMONY AND PIERCE'S MOTION FOR MISTRIAL

Reynolds testified that Pierce had sought Reynolds out for legal advice and that "[Pierce] talked to me about his appeal and prosecutorial misconduct." 7 RP (Oct. 30, 2014) at 1252.  Pierce immediately objected to the reference to his prior appeal.  One of Pierce's attorneys noted that the jurors began to write on their note pads after Reynolds's statement.

Pierce immediately moved for a mistrial, arguing that the mention of an appeal had prejudiced him because it implied that another jury had convicted Pierce and his convictions had been reversed on a "'technicality.'"  CP at 1644.  Pierce argued that the mention of an appeal was "tantamount to stating that [Pierce] had previously been convicted."  CP at 1643.

The trial court recessed the trial to hold a hearing on Pierce's motion.  After the hearing, the trial court denied the motion for a mistrial.  It found that the statement was "serious," but in context did not rise "to the same seriousness level as . . . if a prior conviction had been inadvertently admitted."  8 RP (Nov. 3, 2014) at 1274-75.  And in the trial court's view, a simple instruction to the jury to disregard the last answer cured any prejudice.  The trial court did not instruct the jury to disregard the word "'appeal'" because to do so would have unnecessarily drawn the word to the jury's attention.  8 RP (Nov. 3, 2014) at 1276.  Instead, when trial resumed, the trial court ordered the jury to "disregard and to strike the last statement by the witness, Mr. Reynolds."  8 RP (Nov. 3, 2014) at 1308.

C.  CAUTIONARY INSTRUCTION REGARDING INFORMANT TESTIMONY

Pierce requested that the trial court give a cautionary instruction regarding the testimony of Reynolds and Dhaenens.  The proposed instruction would remind the jury that Reynolds and Dhaenens received plea bargains for their testimony.  It would urge the jury to consider how

9

Reynolds's and Dhaenens's testimony may have been influenced and to examine their testimony with greater caution than that of the other witnesses.

The trial court declined to give the cautionary instruction. It noted that no Washington case required such an instruction. Further, the jury would be instructed that it was the sole judge of a witness's credibility and the weight to give a witness's testimony, which made a cautionary instruction superfluous.

## D. VERDICT

The jury found Pierce guilty of all counts charged: two counts of first degree murder and one count each of first degree robbery, burglary, and arson, theft of a .25-06 firearm from the Yarrs' home and second degree possession of that firearm, and second degree theft of a debit card.

The trial court sentenced Pierce to 1,404 months of confinement. The trial court ordered Pierce to pay a total of $222,602 in legal financial obligations (LFOs), most of which was restitution. The exceptional sentence imposed would result in Pierce spending the rest of his life in jail. The trial court entered an order of indigency allowing Pierce to seek appellate review at public expense.

## ANALYSIS

### I. CrR 8.3(B) MOTION TO DISMISS DUE TO MEDICATION DISCONTINUANCE

Pierce claims that the trial court erroneously denied his CrR 8.3(b) motion to dismiss following the mistrial after Conmed discontinued his medication. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

CrR 8.3(b) states that "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when

there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Dismissal with prejudice under this rule is an extraordinary remedy appropriate in only "'truly egregious cases of mismanagement or misconduct.'" *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (quoting *State v. Duggins*, 68 Wn. App. 396, 401, 844 P.2d 441, *aff'd*, 121 Wn.2d 524, 852 P.2d 294 (1993)). And dismissal is available only where the prejudice to the defendant's fair trial right cannot be remedied by granting a new trial. *State v. Sherman*, 59 Wn. App. 763, 767, 801 P.2d 274 (1990) (quoting *State v. Baker*, 78 Wn.2d 327, 332-33, 474 P.2d 254 (1970)).

We review a trial court's decision under CrR 8.3(b) for abuse of discretion. *State v. Oppelt*, 172 Wn.2d 285, 297, 257 P.3d 653 (2011). The trial court abuses its discretion when its "'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)). "A decision is 'manifestly unreasonable' if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take,' . . . and arrives at a decision 'outside the range of acceptable choices.'" *Rohrich*, 149 Wn.2d at 654 (quoting *State v. Lewis*, 115 Wn.2d 294, 298-99, 797 P.2d 1141 (1990); *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)).

## B. NO PREJUDICE

Pierce's sole argument that he suffered prejudice affecting his fair trial rights is that the alleged arbitrary action and government misconduct "necessitated a waiver of [Pierce's right to a] speedy trial to allow counsel time to investigate the circumstances and prepare the motion to dismiss." Br. of Appellant at 49. Even if we assume, without deciding, that the medication

discontinuation was a result of government misconduct or arbitrary action, Pierce's argument fails because he does not show prejudice.

To prevail on a CrR 8.3(b) motion to dismiss, a defendant bears the burden of showing "prejudice to [his rights] which materially affect the accused's right to a fair trial," in addition to government misconduct or arbitrary action. We review a trial court's determination of whether there was prejudice affecting the defendant's right to a fair trial for abuse of discretion. *Rohrich*, 149 Wn.2d at 656. Violation of a defendant's speedy trial right may result in dismissal under CrR 3.8 where the defendant is forced to choose between the right to a speedy trial and the effective assistance of counsel. *State v. Thomas*, 95 Wn. App. 730, 735, 976 P.2d 1264 (1999) (citing *Sherman*, 59 Wn. App. at 769).

On March 24, the trial court granted a mistrial because Pierce's medication had been discontinued during his third trial, which rendered Pierce incompetent. At the time this mistrial was granted, Pierce had already waived his right to a speedy trial through May 31, 2014. Pierce extended the waiver to October 31, 2014 in order to prepare his motion to dismiss with prejudice because a trial would not be necessary if he succeeded on the motion.

In Pierce's CrR 8.3(b) motion, he argued that the State's misconduct had forced him to waive his speedy trial right in order to investigate and prepare his motion to dismiss. The trial court rejected this argument and concluded that Pierce was not forced to waive his speedy trial further. Pierce was not forced to choose between sacrificing his right to a speedy trial or his right to adequately prepared counsel. The trial court noted that Pierce suffered no prejudice to his new trial because he was merely "inconvenienced" by the new trial. CP at 1465.

Pierce fails to explain why the two months from March 24 to May 31 was not an adequate period in which to prepare his motion to dismiss. Further, Pierce's prejudice argument appears to rest on prejudice to his motion to dismiss, but does not explain how the waiver of his speedy trial right hampered the effectiveness of his counsel at his fourth trial. Pierce does not argue how he was denied a fair trial at his fourth trial nor how he suffered any prejudice other than mere inconvenience, even though CrR 8.3(b) requires prejudice materially affecting Pierce's right to a fair trial. Having just prepared for the third trial, Pierce was fully prepared to litigate the fourth trial. Because Pierce neither explained why he needed additional time to prepare or how his right to a fair trial was prejudiced, the trial court did not abuse its discretion when it denied Pierce's motion to dismiss for failure to show prejudice.

We affirm the trial court's denial of Pierce's motion to dismiss with prejudice under CrR 8.3(b).

## C. Due Process Violation not "Outrageous" Conduct

In addition to his CrR 8.3(b) arguments, Pierce claims that the State's misconduct was such a "shocking" violation of his due process right that the trial court should have dismissed the charges against him with prejudice, regardless of whether a new trial could cure the prejudice. Br. of Appellant at 44. We disagree.

We review due process violations de novo. *State v. Salavea*, 151 Wn.2d 133, 138, 86 P.3d 125 (2004). Due process claims are a subcategory of government misconduct under CrR 8.3(b). *Oppelt*, 172 Wn.2d at 297. A due process violation merits dismissal of charges under CrR 8.3(b) if the government misconduct is "'so shocking that it violates fundamental fairness.'" *State v. Athan*, 160 Wn.2d 354, 376-77, 158 P.3d 27 (2007) (quoting *State v. Lively*, 130 Wn.2d 1, 19, 921

P.2d 1035 (1996)).  But dismissal is "appropriate only in the most egregious of cases," involving "outrageous" conduct.  *Athan*, 160 Wn.2d at 377.

Here, two nurses forgot to extend Pierce's medication, contrary to Conmed's policy, which resulted in Pierce being unmedicated for a full day of trial.  The trial court concluded that there was "no basis to dismiss the case purely based on what [Pierce] alleges to be 'outrageous conduct' by the government."  CP at 1474.  The trial court acknowledged that it had declared a mistrial upon finding that Pierce had been rendered incompetent for a full day of trial, violating his right to due process, among other rights.  However, a due process violation, without more, did not automatically mandate dismissal of the charges with prejudice.

Pierce relies on *State v. Martinez* to support his contention that the trial court erred.  121 Wn. App. 21, 86 P.3d 1210 (2004).  There, even after learning a gun used in the robbery could not have been in the defendant's possession, the prosecutor concealed the exculpatory evidence from the defendant until the middle of the trial.  *Martinez*, 121 Wn. App. at 33-34.  Division Three of this court concluded that the prosecutor's misconduct was "[i]ncredibl[e]" and "so egregious that it violated principles of fundamental fairness."  *Martinez*, 121 Wn. App. at 24, 28.  Thus, the court held that it was no abuse of discretion for the trial court to dismiss the charges with prejudice.  *Martinez*, 121 Wn. App. at 36.  *Martinez* is distinguishable.

Even assuming, without deciding, that the State was responsible for the nurses' failure to administer the medications, the nurses' actions are not the "outrageous" or "shocking" conduct that would justify dismissal.  Unlike *Martinez*, there were no intentional acts by the prosecutor to withhold or hide evidence.  Accordingly, we reject Pierce's argument that due process mandates dismissal of the charges against him.

## II. "Appeal" Testimony and Mistrial Motion

Pierce argues that the trial court abused its discretion when it denied his motion for a mistrial after Reynolds mentioned "[Pierce's] appeal" during Reynolds's testimony. Br. of Appellant at 53. We disagree.

### A. Standard of Review and Applicable Law

We review the trial court's denial of a mistrial for abuse of discretion; "we find abuse only 'when no reasonable judge would have reached the same conclusion.'" *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (internal quotation marks omitted) (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)).

"The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *Emery*, 174 Wn.2d at 765. We examine three factors to determine the effect of an irregularity: "'(1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it.'" *Emery*, 174 Wn.2d at 765 (quoting *Hopson*, 113 Wn.2d at 284). We defer to the trial court in our analysis because the trial court can best discern any prejudice. *State v. Garcia*, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013), *review denied*, 179 Wn.2d 1026 (2014).

### B. *HOPSON* FACTORS

1.    "SERIOUS" IRREGULARITY

Pierce contends that the irregularity was "serious" and that the trial court concluded that it was serious.[5]  Br. of Appellant at 52.  He argues that the jury could infer from mention of Pierce's appeal that Pierce had previously been convicted of the charges for which he was being tried and that his convictions had been reversed because of some "technicality."  Br. of Appellant at 56.  Pierce's argument fails.

Under *Hopson*, a serious irregularity is one that is "serious enough to materially affect the outcome of the trial."  113 Wn.2d at 286.  Here, Reynolds did not explicitly state that Pierce had been convicted in the past.  Instead, Reynolds said that Pierce had talked about "his appeal."  7 RP (Oct. 30, 2014) at 1252.  The jury had no context from which to determine what appeal the witness was referencing.  From Reynolds's comment, the jury did not have enough information to know whether Reynolds was discussing a successful appeal from a conviction for the same charges.  Thus, this brief and ambiguous reference to an appeal does not rise to the level of being "serious enough to materially affect" the outcome of Pierce's trial.  *Hopson*, 113 Wn.2d at 286.  We conclude that the first *Hopson* factor weighs against a mistrial.

---

[5] It is not apparent that, as Pierce claims, the trial court concluded the irregularity was "serious." Br. of Appellant at 52.  The trial court stated, "In looking at the [*Hopson*] factors of seriousness, although it is a serious statement, I have to look at it in its context.  There is nothing said specifically about what appeal or prosecutorial misconduct was being referred to. . . . [W]ithout more, I don't think in context it rises to the same seriousness level as . . . if a prior conviction had been inadvertently admitted."  8 RP (Nov. 3, 2014) at 1274-75.

2.    CUMULATIVE EVIDENCE OF AN APPEAL

The second *Hopson* factor is whether the evidence is cumulative. Where evidence is "merely cumulative" of other evidence properly presented at trial, this factor weighs against a mistrial. *Emery*, 174 Wn.2d at 766. But if evidence is not cumulative of properly admitted evidence, this factor favors a mistrial. *See Emery*, 174 Wn.2d at 766. Here, the trial court correctly noted that there was no other mention of an appeal and that this factor weighed in favor of a mistrial. We conclude that the second *Hopson* factor weighs in favor of a mistrial.

3.    INSTRUCTION TO DISREGARD

Pierce argues that the trial court's "vague" instruction to the jury to disregard Reynolds's last answer "could not effectively cure the prejudice" from the irregularity. Br. of Appellant at 55.

The third *Hopson* factor is whether the trial court properly instructed the jury to disregard the irregularity. 113 Wn.2d at 284. A jury is presumed to have followed its instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015). Even a serious irregularity may be cured when the trial court immediately gives a curative instruction that does not unduly emphasize the irregularity. *See State v. Gamble*, 168 Wn.2d 161, 178, 225 P.3d 973 (2010).

Here, when Reynolds mentioned "[Pierce's] appeal" (7 RP (Oct. 30, 2014) at 1252), the trial court instructed the jury to disregard Reynolds's "last statement." 8 RP (Nov. 3, 2014) at 1308. The trial court deliberately avoided using the word "appeal" because it did not want to emphasize the improper testimony. Similarly, in *Gamble*, our Supreme Court held that the prejudice from even a serious irregularity was cured when the trial court gave curative instructions in a way that did not unduly emphasize the improper testimony. 168 Wn.2d at 178. As discussed, the brief mention of an "appeal" was not a serious irregularity. But even so, any prejudice that

resulted was cured by the trial court's instruction to disregard Reynolds's "last statement." 8 RP (Nov. 3, 2014) at 1308. Thus, we conclude that the third *Hopson* factor weighs against a mistrial.

4.     NO ABUSE OF DISCRETION

Although not cumulative, the irregularity was not serious and any prejudice resulting from it was cured by the trial court's instruction. Accordingly, Pierce cannot show that he was so prejudiced that nothing short of a new trial could ensure that he was fairly tried. Thus, the trial court did not abuse its discretion when it denied Pierce's mistrial motion.

## III.  EVIDENCE OF PELLET GUN THEFT

Pierce argues that the trial court abused its discretion when it admitted evidence over Pierce's objection that he had shoplifted a pellet gun from a hardware store earlier in the evening of the murders. He further contends that the error was harmful because it invited the jury to convict Pierce of the burglary and robbery and, thus, the murder charges. We hold that any error was harmless.

Evidentiary error is harmless if "'the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" *State v. Brockob*, 159 Wn.2d 311, 351, 150 P.3d 59 (2006) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). But an error is harmful if "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

Along with the murders and arson, Pierce was charged with the theft of a firearm and theft of a debit card. During closing, he conceded that he was guilty of the debit card theft. Because

18

Pierce admitted to the jury that he stole and used a debit card, it is hard to see how the fact that he also shoplifted a pellet gun would have affected the outcome of the trial. Pierce cannot show that there is any probability that the outcome of the trial would have differed had the jury not heard the evidence of the pellet gun shoplifting. Accordingly, any error was harmless.

IV. IDENTIFICATION OF PIERCE IN ATM VIDEO

Pierce argues that the trial court abused its discretion when it allowed Detective Apeland to testify that he recognized Pierce as the man in the photographic stills from the ATM surveillance video. He claims that admission of the identification testimony was improper because Detective Apeland was no more likely to correctly identify Pierce from the photographs than the jury was. We disagree.[6]

We review the trial court's decision to admit lay opinion evidence for abuse of discretion. *State v. Blake*, 172 Wn. App. 515, 523, 298 P.3d 769 (2012) (citing *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001)). A trial court has "wide discretion" when it determines the admissibility of evidence. *Demery*, 144 Wn.2d at 758. ER 701 permits a lay witness to give opinion testimony if the opinion is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of . . . the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."

---

[6] Because we rely on the sufficient contact factor to hold that it was no abuse of discretion to admit Detective Apeland's lay opinion testimony, we need not reach whether Pierce's appearance had changed such that Detective Apeland was more likely to identify Pierce than the jury. "[O]pinion testimony may be appropriate when the witness has had sufficient contacts with the person *or* when the person's appearance before the jury differs from his or her appearance in the photograph." *State v. George*, 150 Wn. App. 110, 118, 206 P.3d 697 (2009) (emphasis added).

A lay witness's opinion testimony identifying a person in surveillance photographs is allowed as long as "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *State v. Hardy*, 76 Wn. App. 188, 190-91, 884 P.2d 8 (1994), *aff'd*, 129 Wn.2d 211, 916 P.2d 384 (1996). This includes either when the witness has had "sufficient contacts" with the person or when the person's appearance before the jury differs from the person's appearance in the photographs. *State v. George*, 150 Wn. App. 110, 118, 206 P.3d 697 (2009). The requirement that the witness be more likely than the jury to correctly identify the defendant ensures that the witness's testimony does not improperly invade the province of the jury. *George*, 150 Wn. App. at 118.

The trial court found that Detective Apeland had three to four personal contacts with Pierce, including two separate arrests of Pierce and a face-to-face conversation with Pierce. Accordingly, the trial court concluded that Detective Apeland had "sufficient prior contacts" to testify that Pierce was shown in the photographs. CP at 760. The trial court was correct—based on these prior contacts with Pierce, at least one of which was a face-to-face conversation, Detective Apeland was more likely to identify Pierce than the jury.

Pierce cites to *George*, in which we held that a trial court abused its discretion when it allowed an officer to identify two defendants based on seeing them earlier on the day of the crime. 150 Wn. App. at 115-16. Pierce argues that Detective Apeland's contacts with Pierce were "no more extensive than the ones found insufficient in *George*." Br. of Appellant at 65. To the contrary, *George* involved prior contact that occurred on the very same day of the arrests. 150 Wn. App. at 115-16. Here, however, Detective Apeland's contacts with Pierce consisted of three to four contacts over the five years preceding the identification in the ATM photographs.

Accordingly, it was not an abuse of discretion for the trial court to allow Detective Apeland to identify Pierce in the ATM photographs on this basis.

V. CAUTIONARY INSTRUCTION REGARDING INFORMANTS

Pierce contends that because the testimony of a jailhouse informant is "inherently untrustworthy," the trial court should have given a cautionary instruction to the jury regarding the testimony of Reynolds and Dhaenens. Br. of Appellant at 67. The trial court properly instructed the jury.

We review a trial court's refusal to give an instruction for abuse of discretion. *State v. Hummel*, 165 Wn. App. 749, 777, 266 P.3d 269 (2012). A trial court necessarily abuses its discretion if it applies the wrong legal standard or bases its ruling on an erroneous view of the law. *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007). And we review de novo the underlying questions of law. *Lord*, 161 Wn.2d at 284.

Pierce's request for a cautionary instruction to accompany the testimony of jailhouse informants is not novel. At least one Washington decision has considered this argument and rejected it, holding that it was not error for the trial court to reject a defendant's proposed cautionary instruction. *See Hummel*, 165 Wn. App. at 777-79; *see also State v. Walker*, 24 Wn. App. 78, 82-83, 599 P.2d 533 (1979) (rejecting the defendant's argument for a cautionary instruction to accompany a paid informant's testimony).

Here, the trial court declined to give a cautionary instruction because no Washington case required such an instruction and because the jury would be instructed that it was the sole judge of the witnesses' credibility and the weight to give their testimony. Because Washington law does not require a cautionary instruction for the testimony of jailhouse informants and the instruction

given was sufficient to remind the jury it was the sole judge of the weight to give the informants' testimony, we hold that the refusal to give the instruction was not error.

## VI. CUMULATIVE ERROR

Pierce argues that taken together, the improper reference to his appeal, admission of evidence of shoplifting the pellet gun, Detective Apeland's identification of Pierce in the ATM video, and the lack of cautionary instructions amount to cumulative error. We reject Pierce's cumulative error argument.

Even if each individual error standing alone was harmless, cumulative error may warrant reversal. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Cumulative error applies to instances where there are "several trial errors" that alone do not merit reversal, but when combined, deny the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

Here, only Pierce's argument that the trial court erroneously admitted evidence of his shoplifting a pellet gun has merit. As discussed, however, any error from this evidence's admission was harmless. Because Pierce can claim at best one error, the doctrine of cumulative error—which requires "several" errors that combine to deprive the defendant of a fair trial—cannot apply. We therefore reject Pierce's cumulative error argument.

## VII. APPELLATE COSTS

Pierce requests that we deny appellate costs should the State substantially prevail upon appeal. We grant his request.

We have broad discretion to grant or deny appellate costs to the substantially prevailing party. *See* former RCW 10.73.160(1) (1995). Ability to pay is a factor in the exercise of that

No. 47011-0-II

discretion. *State v. Sinclair*, 192 Wn. App. 380, 389, 367 P.3d 612, *review denied*, 185 Wn.2d 1034 (2016).

At sentencing, the trial court noted that the 1,404-month sentence imposed would result in Pierce spending the rest of his life in prison. The trial court entered an order of indigency so that Pierce could seek review at public expense. It appears that Pierce will spend his life in prison, has no present ability to pay appellate costs, and it is unlikely he will have the future ability to pay. We decline to impose appellate costs.

We affirm Pierce's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.