# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45665-6-II |
| Respondent, | |
| v. | |
| DAROLD R. J. STENSON, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Darold R. J. Stenson appeals his convictions for two counts of premediated first degree murder with aggravating factors. We hold that the trial court did not err when it (1) granted the State's motion to continue the trial, (2) denied Stenson's CrR 8.3(b) motion to dismiss, (3) denied Stenson's motion to dismiss based on a due process violation, and (4) denied Stenson's motion to suppress evidence. We also hold (5) that Stenson was not entitled to a spoliation instruction and (6) that the trial court did not err when it denied Stenson's motions for mistrial or (7) when it admitted evidence of a defense witness's prior drug conviction. We further hold that (8) the trial court's reasonable doubt jury instruction was proper, (9) the prosecutor's rebuttal argument was not misconduct, and (10) there is no cumulative error to entitle Stenson to a new trial. Thus, we affirm Stenson's convictions.

FACTS

I. BACKGROUND

A. FACTUAL HISTORY

In the early morning hours of March 25, 1993, law enforcement arrived at the Stenson home in response to a 911 call; Stenson met the responding officers outside the home. Stenson led the officers to the body of Frank Hoerner, Stenson's friend and business partner, who was lying face down on the floor in the main-floor guest bedroom, dead of an apparent gunshot wound to the head. Officers found a gun on the floor near Hoerner's[1] left hand.

Stenson then led the officers upstairs to the master bedroom where they found his wife, Denise Stenson,[2] lying in bed with a gunshot wound to her head. Denise Stenson was alive, but died the following day in the hospital. The State charged Stenson with two counts of premediated first degree murder with aggravating factors.

B. THE FIRST TRIAL

During Stenson's first trial, the pants that Stenson had worn on the day of the murders provided forensic evidence that directly connected him to the murders—gunshot residue (GSR)[3]

---

[1] To avoid confusion with Denise Hoerner, Frank Hoerner's widow, we refer to Frank Hoerner by his last name only and mean no disrespect.

[2] To avoid confusion with Denise Stenson, we refer to Darold Stenson by his last name only and mean no disrespect.

[3] Gunshot residue (GSR) is created during discharge of a firearm and consists of small particles, visible only with magnification that float in the air and are easily transmitted from one object to another. Clerk's Papers (CP) at 4419.

which was found in the pockets of the pants and bloodstains on the front of the pants. *In Re the Personal Restraint of Stenson*, 174 Wn.2d 474, 478, 491, 276 P.3d 286 (2012).[4] Detective Monty Martin, one of the responding officers to the scene in 1993, had collected Stenson's pants, socks, belt, sweatshirt, and shoes as evidence. Stenson initially told law enforcement that he had discovered Hoerner's body and that he had knelt next to it, but Stenson contended that he did not touch or otherwise contact the body. *In Re Stenson*, 174 Wn.2d at 478. The bloodstains were consistent with Hoerner's blood protein profile. *In Re Stenson*, 174 Wn.2d at 478.

Michael Grubb, supervising Forensic Scientist of the Washington State Patrol Crime Laboratory, testified at trial that there were bloodstains on the knee of Stenson's right pant leg and left pant leg which were caused by airborne droplets, and additional bloodstains on the left pant cuff which were caused by medium velocity droplets consistent with a beating by a bloody object. Grubb testified that the smaller stains on Stenson's pants appeared to have been "airborne droplets" of blood that were traveling through the air when they struck the pants leg. Trial Verbatim Report of Proceedings (VRP) at 2454. Grubb also testified that the larger stains on the right knee were Hoerner's blood.

Grubb testified that the blood on the right knee of the pants could not have gotten there by Stenson touching the body after it was on the floor or by kneeling next to the body, and that the blood had to have been deposited on the pants before Hoerner's body came to rest on the bedroom floor. *In Re* Stenson, 174 Wn.2d at 478. Grubb concluded that the stains on the right leg of the pants came to be on the pants while Hoerner was in some position other than his final resting

---

[4] We refer to the Washington Supreme Court's opinion, *In Re Stenson*, and adopt their version of the facts where appropriate.

position at the scene, most likely while he was up off the floor. According to Grubb, the stains on the right knee area of the pants could not have been caused by contact with any of the bloodstained vertical surfaces in the laundry room area of the crime scene (the door, the wall, the freezer, or the dryer). This was so because there was no corresponding pattern of bloodstains on the floor of the laundry room or bedroom where Hoerner's body was found. This testimony refuted Stenson's statement that he discovered Hoerner dead on the bedroom floor. *In Re Stenson*, 174 Wn.2d at 478.

In 1994, a jury convicted Stenson of premeditated first degree murder with aggravating factors for the deaths of Denise Stenson and Frank Hoerner. Stenson was sentenced to death on August 19, 1994. In July 1997, our Supreme Court affirmed Stenson's convictions and the death penalty sentence. *See State v. Stenson*, 132 Wn.2d 668, 940 P.2d 1239 (1997). Our Supreme Court rejected four subsequent personal restraint petitions (PRP). *Stenson*, 174 Wn.2d at 478.

C. EVENTS SUBSEQUENT TO THE FIRST CONVICTION AND APPEAL

1. New Evidence

In 2008, the State notified Stenson's appellate counsel that the State's expert witness at the first trial, FBI Special Agent Ernest Peele, who testified about the GSR analysis, had testified beyond "the scope of what the evidence could properly show." *In Re Stenson*, 174 Wn.2d at 479. Although the GSR evidence was of relatively little significance at the first trial, the information about Peele's testimony raised additional questions for Stenson's appellate counsel, who then submitted a discovery request asking the State to turn over all the records "relating to bullet lead

analysis, GSR, and blood spatter testing."[5] *In Re Stenson*, 174 Wn.2d at 479. In its 2009 response, the State disclosed new evidence including: (1) photographs of Detective Martin wearing Stenson's pants with the right pocket turned out and showing Detective Martin's ungloved hands and (2) an FBI file containing notes related to the GSR testing revealing that someone else, other than Peele, had performed the GSR testing. *In Re Stenson*, 174 Wn.2d at 479.

2. Stenson's Fifth PRP and First Reference Hearing

In response to the State's disclosure, Stenson filed his fifth PRP alleging ineffective assistance of counsel because his counsel had failed to discover this previously undisclosed evidence. He then filed his sixth PRP alleging that the State had withheld materially exculpatory evidence, which violated *Brady*.[6] Our Supreme Court ordered the Clallam County Superior Court to conduct a reference hearing to determine whether the evidence was "newly discovered" and if so, whether the newly discovered evidence would have changed the outcome of the trial. *In Re Stenson*, 174 Wn.2d at 480.

At the conclusion of the reference hearing, the trial court found that photographs showed Stenson's pants being handled by Detective Martin, who was ungloved, and that the pockets were turned inside out to look for blood evidence six days prior to being sampled by the FBI for GSR. *In Re Stenson*, 174 Wn.2d at 480. Subsequently, Detective Martin took the pants to his garage for sampling and the pants pockets were again turned inside out and the samples were sent to the FBI for GSR testing. *In Re Stenson*, 174 Wn.2d at 480-81. The trial court also found that the FBI lab

---

[5] The term "blood spatter" refers to the pattern of blood evidence found on the pants. CP at 2453-54.

[6] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

notes indicated that Kathy Lundy, not FBI agent Peele, had performed the GSR testing, only four grains of GSR had been found after a series of examinations, and the number of GSR particles that were found was relatively insignificant. *In Re Stenson*, 174 Wn.2d at 483. The trial court further found that both parties were aware of the FBI file and the lab notes but that neither party believed there was anything worth looking at in the FBI file. *In Re Stenson*, 174 Wn.2d at 483. The trial court then concluded that the photographs of Detective Martin wearing Stenson's pants were sufficient to cause the subsequent GSR test evidence to be wholly unreliable, and that if this had been made known to the trial court and an appropriate objection made, the GSR evidence would have been excluded. *In Re Stenson*, 174 Wn.2d at 484. But, the trial court ultimately found that Stenson was not prejudiced because the FBI file and the photographs would not have changed the outcome of the trial. *In Re Stenson*, 174 Wn.2d at 484, 491. Furthermore, the trial court declined defense counsel's request that it rule on whether the newly discovered evidence violated *Brady*. *In Re Stenson*, 174 Wn.2d at 484.

3. Second Reference Hearing

Upon reviewing the trial court's reference hearing findings and conclusions, our Supreme Court remanded the case for a second reference hearing on whether the State had violated *Brady*. *In Re Stenson*, 174 Wn.2d at 484. At the second reference hearing, the trial court concluded that the evidence in the FBI file relating to the GSR evidence and the photographs contained exculpatory or impeaching information and that the newly discovered evidence should have been provided to the defense. *In Re Stenson*, 174 Wn.2d at 484, 490. The trial court also found and concluded that that there was no prejudice to Stenson because the newly discovered evidence

would not have changed the outcome of the trial because the blood evidence on the pants provided the jury with strong evidence of Stenson's guilt. *Stenson*, 174 Wn.2d at 484.

> The blood spatter evidence, however, not the GSR evidence, was the most significant evidence at trial. [T]he weight of the circumstantial evidence against Mr. Stenson coupled with the blood spatter evidence directly linked him to the initial attack on Mr. Hoerner is compelling.

Clerk's Papers (CP) at 4434.

At the second reference hearing, the trial court stated, "The question presented to this court is whether use of [the newly discovered evidence] was so unfair as to undermine confidence in the verdict." CP at 4332. The trial court then stated,

> Viewing the totality of the evidence at trial[,] I cannot find that had the evidence of the . . . photos and FBI bench notes been timely disclosed to the defense that the result of the proceeding would have been different. It would not be sufficient to undermine confidence in the verdict of the jury.

CP at 4333.

4. Supreme Court's Review of Second Reference Hearing

Upon reviewing the trial court's ruling from the second reference hearing, our Supreme Court agreed with the trial court in part and held that substantial evidence supported the trial court's finding that "the FBI file qualifies as impeachment evidence for *Brady* purposes and . . . was favorable to Stenson on the issue of guilt." *In Re Stenson,* 174 Wn.2d at 489. Our Supreme Court disagreed with the trial court's conclusion that there was no prejudice to Stenson as a result of the State's *Brady* violation. *In Re Stenson*, 174 Wn.2d at 491. Our Supreme Court explained that the contamination of the GSR evidence called into question the reliability of the pants as evidence in the case against Stenson and that "the integrity and quality of the State's entire investigation,

7

evidence handling procedures and case presentation would have been called into question." *In Re Stenson*, 174 Wn.2d at 491. Further, based on the contaminated evidence,

> Stenson's counsel would have been able to demonstrate to the jury that a key exhibit in the case—Stenson's [pants]—had been seriously mishandled and compromised by law enforcement investigators[, and that] the State's mishandling of the [pants] with regard to GSR testing would have led to further inquiry by Stenson's counsel into possible corruption of the blood spatter evidence.

*In Re Stenson*, 174 Wn.2d at 492.

> Thus, the defense theory at trial could have challenged the blood evidence with
>
> the fact that the [pants] may have been folded over when the blood spatter[7] was wet. Instead, the jury was left with only one explanation for the blood spatter, which was that it could not have appeared on Stenson's [pants] after [Hoerner] came to his final resting place.

*In Re Stenson*, 174 Wn.2d at 492.

In May 2012, Our Supreme Court granted Stenson's sixth PRP,[8] reversed Stenson's convictions and sentence, ordered that the GSR evidence be suppressed, and remanded the case for a new trial. *In Re Stenson*, 174 Wn.2d at 494.

---

[7] Stenson's forensic expert on blood evidence, Kay Sweeney, opined that the pants "were folded over in a manner that allowed for blotting transfer of the original [bloodstains] on the [right] knee to adjacent fabric." CP at 1061. She wanted to do additional testing to determine how the blood came to be deposited on the pants.

[8] Our Supreme Court also ruled that Stenson's fifth PRP was moot. *In Re Stenson*, 174 Wn.2d at 494.

II. STENSON'S SECOND TRIAL—2013

A. PRETRIAL MOTIONS

    1. Motions To Continue

After the Supreme Court's remand, a new trial date was set for March 4, 2013. In January 2013, Stenson moved to continue the trial date to July due to the discovery demands. At that motion hearing, the prosecutor indicated that a "more realistic" date for trial would be in September based on the age of the case, the procedural history, and the anticipated amount of trial preparation that would be required. VRP (1/11/2013) at 20. The prosecutor also advised the trial court that she might not be ready for a July trial due to a family member's serious illness. The trial court granted Stenson's motion, continuing the trial to July 15.

On June 5, 2013, the State filed a motion to continue the trial. The prosecutor argued that good cause existed for a continuance for several reasons: (1) the prosecutor had received seven public records requests from the defense which had required substantial resources to respond to and which took away resources from trial preparation, including time spent by the prosecutor's investigator to answer the records requests; (2) the resources within the prosecutor's office were such that she was the only additional prosecutor assigned to the case; (3) the prosecutor's immediate family member's serious illness over the past year had impacted her ability to be ready for trial in July because she had lost four months of work time; (4) the State needed additional time to respond to and argue over 1300 pages of pretrial motions recently filed by the defense; (5) the prosecutor was having difficulties in locating witnesses, including witnesses who had conducted the initial investigation of the murders in 1993; and (6) that the defense had been ordered to provide the State with outstanding discovery, transcripts from witness interviews, and old police reports

no longer available to the State; yet the discovery had not yet been received, and defense experts had not completed their examinations of the evidence or provided the State with their reports.

Stenson objected and argued that the State had adequate notice and time to prepare. Stenson suggested that the State should have allocated its internal resources more efficiently.

In addressing any prejudice to the defendant, the trial court stated,

[U]nder the circumstances, the amount of continuance we are talking about here today can in no way substantially prejudice the Defendant in the presentation of his defense. I understand he's in custody. He's been in custody for a long time. But while this allows the State some additional time to prepare for trial, it also allows the Defense team additional time to prepare for trial and deal with several motions that have been filed by the State as pretrial motions.

So, if there's any prejudice to [] Stenson it is certainly minimal at this point. I think the reasons for granting the continuance are compelling.

VRP (6/12/2013) at 37-38. The trial court found good cause, granted the State's motion, and ruled that "the administration of justice" required the continuance in order for a fair trial to occur for both parties. VRP (6/12/2013) at 34. After further discussion with the parties, the trial court set a new trial date for September 16, the earliest possible date, in part because of defense counsel's unavailability due to a preplanned vacation in August.

2. Motion To Dismiss

Stenson filed a motion to dismiss the criminal charges under CrR 8.3(b). Stenson's motion alleged State mismanagement of the case: (1) The State's mishandling of the pants evidence; the State's failure to preserve the blood evidence on the pants because cuttings of the blooddroplets taken from the pants for DNA analysis largely consumed the blood evidence and those cuttings were subsequently destroyed by the FBI, (2) the destruction of the original 911 CAD log on the

10

day of the murders, and (3) that a number of critical witnesses[9] were unavailable or information

lost; thus compromising his ability to proffer an "other suspect" defense implicating Denise

Hoerner, David Oberman, and Tim Robbins. Stenson argued that the State's mismanagement of

the case, including the prior *Brady* violation prejudiced his right to a fair trial, and that dismissal

of the charges was warranted under CrR 8.3(b).

The trial court ruled that, under CrR 8.3(b), government misconduct in this case was not

limited to any actual misconduct by the prosecutor, but also included any misconduct by the

Clallam County Sherriff's Department, the FBI, and PenCom. The trial court found that the actions

by the State and its agents did not rise to a level that warranted dismissal. The trial court found

that Stenson's ability to conduct a defense and his right to a fair trial were not violated because

> the mistakes, oversights that the Defense relies upon may very well provide grist in
> the forthcoming trial for challenging the credibility of witnesses and the reliability
> of evidence.

VRP (6/12/2013) at 92.

3. Motion To Suppress the Pants as Evidence

Stenson also filed a motion to suppress the pants themselves as evidence, rearguing the

points in the motion to dismiss—that the State's mishandling of the pants evidence had increased

the potential for contamination and that the destruction of the blood spatter evidence compromised

his expert's ability to best analyze the evidence. He also argued that the destruction of the cutouts

from the pants for DNA analysis was not necessary to "facilitate testing" and the State failed to

---

[9] The witnesses include William Perry, David Oberman, Deanne Chapman, Tracey Reed, Cheryl Fabel, Barbara and Philip Oberman, Becky and Jack Mendorf, Tim Robbins, and Carol Johnson.

show that its inability to preserve this evidence outweighed Stenson's need for the evidence. VRP (6/12/2013) at 106-07.

Stenson asserted that the State had to show that the pants were "in substantially the same condition" as they were when Detective Martin removed them from Stenson on the morning of the murders.[10] VRP (6/12/2013) at 117. Stenson also asserted that the photographs taken of the pants on the day of the murders were "fuzzy" and not useful for examination. VRP (6/12/2013) at 115.

The trial court denied Stenson's motion to suppress because there had been "full disclosure of all the information [about the pants]," Stenson was not prejudiced, and his arguments went to the weight of the evidence, not its admissibility; and that he could challenge the credibility and reliability of the pants as evidence at trial. VRP (7/10/2013) at 136. Although the center of the bloodstains were removed when the cuttings were done, several bloodstains maintained a "partial halo" that "allow[ed] some limited ability to make a conclusion" about the source of the bloodstains. VRP (6/12/2013) at 112.

The trial court also ruled that there was "no evidence of actual contamination of the bloodstain evidence on the pants," only "evidence of opportunities for contamination," which Stenson could point out at trial. VRP (7/10/2013) at 137. The trial court also noted that the Supreme Court had already imposed severe sanctions on the State based on the *Brady* violation, reversing the conviction and sentence, remanding for a new trial, and suppressing the GSR evidence.

---

[10] Stenson also challenged the pants on grounds that chain of custody was broken, but he abandoned this argument on appeal. *See* VRP at (6/12/2013) at 117. Stenson did not dispute that the pants were the same ones that Detective Martin collected from him on March 25, 1993.

### 4. Spoliation Instruction

Pretrial, Stenson requested that a spoliation instruction be given at trial on the destruction of the bloodstain evidence on the pants. Stenson's proposed instruction read,

> If you find that the state lost or destroyed or mutilated, altered, concealed, or otherwise caused portions of the pants where the State contends blood spatter or transfer to be present to be unavailable, and the missing portions of the pants would have been material in deciding the material issues in this case, then you may infer that the evidence would have been unfavorable to the State. You may consider this, together with the other evidence, in determining the issues of the case.

CP at 380. In denying Stenson's request, the trial court found that there was an explanation for the cuttings taken from Stenson's pants for DNA analysis of the bloodstains on the pants, there was no basis for Stenson's proposed spoliation instruction, and the instruction if given would constitute an "impermissible comment on the evidence by a trial judge." VRP at 3953.

## B. TRIAL

Stenson's second trial began on September 16, 2013.

### 1. Denise Hoerner's Testimony and Stenson's Motion for Mistrial

Denise Hoerner testified at the second trial. In her response to the prosecutor's question about when Hoerner adopted her son, Denise Hoerner stated,

> Um, we got the name changed and everything and afterwards we saw—we saw a lawyer prior to [Stenson] killing Frank.

VRP at 1288. Stenson objected, and the trial court immediately struck Denise Hoerner's statement and instructed the jury to disregard the remark.

At the next trial recess, Stenson moved for a mistrial based on Denise Hoerner's earlier statement about "[Stenson] killing Frank." VRP at 1312-13. The trial court denied the mistrial

because it had immediately instructed the jury to disregard the comment to cure any potential prejudice, and the trial court "expect[ed] the jury to follow" its curative instruction. VRP at 1313.

Later, in order to clarify its ruling, the trial court sua sponte addressed Stenson's mistrial motion, noting on the record Denise Hoerner's emotional state when she made the remark. *See* VRP at 1354. The trial court made a further record commenting on the testimony from Denise Hoerner, her emotional outbursts, the fact that she had promised to abide by the court's rules while testifying; but that she was hyperventilating, sobbing and shaking uncontrollably at times and that she was unable to comprehend the rules, or unable to conform her behavior, despite being reminded by the court before she testified. The trial court commented that Denise Hoerner was 25 years old when her husband and her close friend [Denise Stenson] were killed but during her testimony, she acted as if these events took place yesterday. The trial court found that Denise Hoerner's testimony assisted the defense and impacted her credibility as a witness. The trial court also stated, "I do think [the jury] will follow my instruction and I am satisfied that I told them to ignore the remark. I have no reason to believe they will not follow that instruction." VRP at 1512.

After Denise Hoerner completed her testimony, Stenson again moved for a mistrial, alleging that Denise Hoerner whispered, "[L]iar, liar, liar" to the jury during her cross-examination. VRP at 1523. The court asked the court reporter to review the record, but nothing was found in the record that Denise Hoerner said, "[L]iar, liar, liar. VRP at 1527. The trial judge noted that he and the court reporter are the two individuals closest to the witness stand, and that neither of them heard any such comment from Denise Hoerner during her testimony.

The trial court asked the jurors whether anyone heard Denise Hoerner make "a comment directed to one or more of the jurors other than an answer to a question." VRP at 1529. Five jurors

stated that they had heard Denise Hoerner make a comment directed at the jury. The trial court then questioned each juror individually. The jurors stated that Denise Hoerner mumbled, made a directed comment to the jury, said that she was "sorry" a number of times, and made comments to clarify her testimony. VRP at 1533.

One juror stated that Denise Hoerner said "liar"—she "would turn and look and go 'he's lying'"—and that Denise Hoerner would continue her comments to elaborate more on her testimony. VRP at 1536. The juror also stated that "I don't think that I heard anything specifically that was . . . detrimental." VRP at 1536. Many of the jurors could not recall specifics regarding the content of Denise Hoerner's comments. All said that they were still able to be fair and impartial, and that Denise Hoerner's comments would not affect their verdict.

After hearing the jurors' responses, the trial court denied Stenson's second mistrial motion, noting that the jury was

> incredibly attentive and all of them realized that what was happening was not appropriate and did their very best to ignore it. I accept their answers that it did not and will not impact their ability to be fair and impartial as jurors.

VRP at 1540.

2. Rae Ellen Wagner Testimony and ER 609 Evidence

Rae Ellen Wagner[11] testified during direct examination that, in 1993, she was friends with Denise Hoerner, Denise and her husband always fought, Denise was often angry at Hoerner over finances, Denise said that she would be better off financially if Hoerner died, and that shortly after

---

[11] Rae Ellen Wagner is formerly known as Rae Ellen Shulda. VRP at 3010-11. Wagner is the name that all parties use to refer to her in the briefing and on the record. This opinion uses the name "Wagner" to avoid confusion and means no disrespect.

15

Hoerner's death, Denise went on vacations with male friends, sold Hoerner's belongings, and began dating men. Wagner stated that Denise Hoerner "didn't paint it as she missed [Hoerner]. She didn't paint it as she was mourning him," and that Denise said Hoerner was "not the perfect man." VRP at 3024. She also testified that Denise spent a lot of money after Hoerner died.

During cross-examination, the State sought to introduce evidence of Wagner's prior drug convictions to impeach her credibility as a witness. Wagner had ten prior felony drug convictions over the previous five years. The State, in support of admitting the evidence against Wagner, argued that

> [t]his witness seems unusually eager to me to . . . slander Ms. Hoerner. She is going far beyond even the questions and volunteering her speculation as to Mrs. Hoerner's spending habits, stuff that she doesn't even need [--] sounds like the witness is jealous of Ms. Hoerner.

VRP at 3030. After hearing argument from both parties, the trial court permitted the prior convictions for the purposes of impeaching Wagner, stating, "[U]nder 609(a), I think it is proper impeachment." VRP at 3030.

After its ruling, the following exchange between the trial court and defense counsel occurred,

> [Defense Counsel]: Your Honor, there has to be a finding under 609(a) that the probative value of the evidence outweighs the prejudice, and I don't think that showing has been made.
>
> [Court]: Well, I do find that. I think it goes right to the credibility of the witness's testimony. I think it should be allowable. Let the jury determine the issue of credibility. I think the State is entitled for the jury to know that those facts exist.

VRP at 3030.

16

3. Trial Court's Reasonable Doubt Instruction

The trial court instructed the jury on reasonable doubt in the following instruction,

> The Defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The Defendant has no burden of proving that a reasonable doubt exists.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 289 (Instr. no. 5). Stenson did not object to this instruction.

4. Closing Arguments

During closing argument, Stenson's counsel argued,

> Now, you know [the prosecutor] started out by going over each piece of evidence with you and trying to kind of mold this into something and another . . . one of the things she said to you is you have to piece this together because the evidence is not very clear. Evidence that's not very clear leads to a reasonable doubt. The State has the burden of proof . . . . I don't think anybody could every really know what happened at the Stenson resident on March 25, 1993. The State's evidence is all jumbled up.

VRP at 4097.

In response to this argument, the prosecutor argued on rebuttal,

> Defense counsel would have you ignore or toss the evidence if it doesn't immediately fir into a nice, clean, tidy picture. It [--] it's all jumbled up, just like a jig saw puzzle . . . . [B]ut you can't tell from [one] piece what the picture is.

CP 4170-71. The prosecutor went on to describe how one organizes the pieces of a puzzle to fit the pieces together,

> [W]hat you do is you pick up a piece. That one does not fit, you look for one with the same color or pattern . . . . And then you do the same thing over and over again.
>
> . . . .
>
> [Y]ou are missing a piece . . . or [two], and [sometimes four or five], and you say crap, I've just spent all these hours working on it and you are missing a piece of the puzzle or [two], but you still you have done that. You don't need the box top to see the picture.
>
> Here, the evidence is here. The pieces are here. At the end you may conclude that you're missing a few pieces, that you have pieces that are gone. But I submit to you, you may have questions, but I submit to you that after full, fair and careful consideration of the facts of the evidence, of the lack of evidence, you're still going to be able to see the picture of what happened to Frank Hoerner and Denise Stenson on March 25, 1993. You will be convinced, you will have an abiding belief in the truth of the charge, that the Defendant killed them.

VRP at 4170-72.

The jury found Stenson guilty of both counts of premediated first degree murder with aggravating factors. Stenson appeals his convictions.

## ANALYSIS

### I. CRR 3.3: TIME FOR TRIAL

Stenson argues that the trial court violated CrR 3.3 when it granted the State's motion for continuance and set trial for September 16, 2013, past the time for trial deadline. We disagree.

Under CrR 3.3(b)(1)(i) and (b)(5), a defendant held in custody pending trial must be brought to trial within 60 days of arraignment or within 30 days after the end of an "excluded period." "Excluded periods" include the time granted for a continuance. CrR 3.3(e)(3). On a motion by either party, the trial court may continue the trial date to a specified date beyond the time for trial period when

18

> continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense. The motion must be made before the time for trial has expired. The court must state on the record or in writing the reasons for the continuance.

CrR 3.3(f)(2).

A trial court's decision to grant or deny a motion for continuance is within the trial court's discretion, which we will not disturb absent an abuse of discretion. *State v. Ollivier*, 178 Wn.2d 813, 822-23, 312 P.3d 1 (2013), *cert. denied*, 135 S. Ct. 72 (2014). The defendant must make a clear showing that the trial court's basis for granting the continuance is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Flinn*, 154 Wn.2d 193, 199, 110 P.3d 748 (2005) (internal quotation marks omitted) (quoting *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004)). "In exercising its discretion to grant or deny a continuance, the trial court is to consider all relevant factors." *State v. Heredia-Juarez*, 119 Wn. App. 150, 155, 79 P.3d 987 (2003).

"Allowing counsel time to prepare for trial is a valid basis for continuance." *Flinn*, 154 Wn.2d at 200. Scheduling conflicts also may be a valid reason for a continuance. *See Heredia-Juarez*, 119 Wn. App. at 153 (continuance was valid due to a scheduling conflict with a prosecutor's "reasonably scheduled vacation"). A continuance may be proper to allow the parties time to locate a witness or when a witness is unavailable. *See State v. Lillard*, 122 Wn. App. 422, 436, 93 P.3d 969 (2004) (witness unavailable due to a medical condition).

Stenson argues that the additional time needed to prepare for trial by the State was due to inadequate staffing which he asserts is not a proper basis for a continuance. But that is not the reason the trial court granted the continuance. In granting the continuance, the trial court

considered the time required by both parties to properly prepare for trial on a twenty-year-old murder case; the budgetary constraints facing the State; the seven public records requests related to Stenson's case investigation requested by the defense since December 2012; the time and staffing resources required for the State to respond to those requests while also preparing for trial; its previous continuance granted at Stenson's request due to discovery demands; the ongoing discovery needs of both parties, including outstanding discovery due by the defense; witness coordination issues; and the amount of pretrial motions, briefings, and hearings required before trial which hearings had not been set. The trial court stated,

> The fact that the [d]efense attorneys in the case, again doing what I consider to be very excellent legal work, have generated a couple thousand hours of work in this case, there's no conceivable way that the prosecuting attorney can devote the same amount of time to that case.
>
> There's nothing unfair about that. [Stenson] is facing the most serious charges known to law. He's entitled to a complete, full, competent defense. He is being afforded that, and I'm going to make sure that he's—that level of work and expertise continues to be provided to him.
>
> But it has to be a level playing field. The State is entitled to a fair trial as well as are the people of this county who Ms. Kelly represents. And I am not going to force her to trial a month from now in a position where she honestly tells the [c]ourt—and I have no reason to question what she's telling me—she simply can not be fully and completely prepared to go to trial on July the 8th.
>
> . . . .
>
> The rule requires that a continuance can be granted if it is required in the administration of justice, and I do find that in this case it is required in the administration of justice.

VRP (6/12/2013) at 33-34. The trial court also considered any prejudice to Stenson and ruled that a two-month continuance would not materially prejudice Stenson, and that "if there's any prejudice to [] Stenson it is certainly minimal at this point." VRP (6/12/2013) at 38. In setting the new trial

20

date, the trial court considered defense counsel's August vacation and the court's own schedule, and then set trial for September 16, the earliest possible date.

Allowing counsel adequate time to prepare for trial given the demands of a complex case with extensive evidence is a valid reason to grant a continuance. Further, the record shows that both Stenson and the prosecutor needed additional time to locate and coordinate witnesses, respond to pretrial motions, and examine discovery. Stenson fails to show that the trial court's decision to grant the continuance based on "the administration of justice" was a manifest abuse of discretion. Thus, we hold that there was no time for trial violation under CrR 3.3(f)(2).

## II. MOTION TO DISMISS

Stenson argues that the trial court erred when it failed to dismiss his case under CrR 8.3(b).[12] Stenson argues that the State did not preserve the bloodstain evidence on the pants, the State did not properly photograph the condition of the pants on the day of the murders, the subsequent cuttings of the bloodstains on the pants for DNA analysis largely consumed the bloodstain evidence, the State then destroyed the cuttings after the DNA testing, and that the State also failed to preserve and then destroyed the original 911 CAD log. Stenson argues that the State's actions amount to government mismanagement and misconduct warranting dismissal of the charges. We agree with Stenson that the State's conduct amounts to governmental

---

[12] Stenson argues that the trial court erred when it failed to grant his motion to dismiss because the State's *Brady* violation in failing to produce (1) photographs of Detective Martin wearing Stenson's pants, and (2) the FBI file showing that another person tested the GSR on the pants not the expert witness who testified in Stenson's first trial justified dismissal. The *Brady* violation was already litigated and our Supreme Court reversed Stenson's convictions and remanded for a new trial. *In Re Stenson*, 174 Wn.2d 474. Stenson fails to demonstrate why we should permit him to relitigate this issue on appeal, and we hold that this argument is without merit.

mismanagement of the case, but we disagree that the State's conduct materially affected Stenson's right to a fair trial because the outcome of the trial would not have been different.

A.  LEGAL PRINCIPLES

CrR 8.3(b) provides that

[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial.  The court shall set forth its reasons in a written order.

In order for a court to dismiss criminal charges under CrR 8.3(b), "the defendant must show by a preponderance of the evidence both (1) arbitrary action or governmental misconduct, and (2) actual prejudice affecting the defendant's right to a fair trial." *State v. Martinez*, 121 Wn. App. 21, 29, 86 P.3d 1210 (2004).   The government's misconduct does not need to be "'of an evil or dishonest nature; simple mismanagement is sufficient.'"  *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997) (emphasis omitted) (quoting *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993)).  Dismissal is "an extraordinary remedy used only in truly egregious cases."  *State v. Flinn*, 119 Wn. App. 232, 247, 80 P.3d 171 (2003), *aff'd*, 154 Wn.2d 193.

The mere possibility of prejudice resulting from governmental misconduct is not sufficient to meet the burden of showing actual prejudice.  *State v. Norby*, 122 Wn.2d 258, 264, 858 P.2d 210 (1993).  The alleged governmental misconduct must have "materially affected the defendant's right to a fair trial."  *State v. Brooks*, 149 Wn. App. 373, 389, 203 P.3d 397 (2009).  That is, but for the State's alleged misconduct, the outcome of trial would have been different.

We review a trial court's decision on a CrR 8.3(b) motion to dismiss for a manifest abuse of discretion. *Martinez*, 121 Wn. App. at 30.  "Discretion is abused when the trial court's decision

22

is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *Blackwell*, 120 Wn.2d at 830. A decision is manifestly unreasonable if the trial court, applying the correct legal standard to the facts of the case, adopts a view "'that no reasonable person would take,'" and a decision is based on untenable grounds "'if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *Martinez*, 121 Wn. App. at 30 (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). We hold that the trial court did not abuse its discretion in denying Stenson's motion to dismiss under CrR 8.3(b).

B. THE BLOODSTAIN EVIDENCE AND THE PANTS EVIDENCE

We agree with Stenson that the State mismanaged the case. The State failed to photograph the pants intact before they were removed on the day of the murders, only one photograph was taken which was of poor quality, the FBI lab discarded the cuttings of the bloodstains on the pants after the DNA testing, the State's detective touched the pants with ungloved hands, and most of the bloodstain evidence on the pants was consumed during the DNA testing.

But Stenson fails to show that the State's mismanagement materially affected his right to a fair trial such that the outcome of the trial would have been different but for the State's mismanagement. First, Stenson was able to proffer his expert's opinion that there was an alternative explanation for the blood spatter and how the blood was actually deposited on the pants to rebut the State's expert as to how the blood came to be deposited on the pants. Second, Stenson was able to draw attention to the mismanagement and offer testimony and evidence to undermine the reliability of the blood evidence on the pants. Third, the blood evidence on the pants was Hoerner's blood, a fact that Stenson did not dispute, which provided the jury with strong evidence

23

of Stenson's guilt. We hold that Stenson fails to show that the outcome of the trial would have been different. Thus, the trial court did not abuse its discretion in denying the motion to dismissal on this basis.

## C.  THE ORIGINAL 911 CAD LOG

Stenson also argues that the State's failure to preserve and destruction of the original 911 CAD log compromised his ability to challenge the State's timeline on the day of the murders. He argues that the State's mismanagement of the case prejudiced him and that dismissal on this basis was warranted. We disagree.

The original 911 CAD log was not intentionally destroyed due to the State's mismanagement. Rather the 911 call service provider inadvertently destroyed the original 911 CAD log when it upgraded its computer system. And other relevant portions of the 911 call were preserved, namely the 911 call transcript and the audio copy of the 911 call tape. Stenson was able to challenge the timeline of the 911 call at trial citing the discrepancies in the State's evidence. *See* VRP (6/12/13) at 55. Thus, he was able to present his defense that the timeline was incorrect. He fails to show that the destruction of the original 911 CAD log prejudiced his ability to obtain a fair trial such that the outcome at trial would have been different. Thus, we hold that the trial court did not abuse its discretion in denying the motion to dismiss on this basis.

D. UNAVAILABLE WITNESSES AND INFORMATION

Stenson also argues that critical witnesses and information were "unavailable" [13] after 20 years due to the State's mismanagement and *Brady* violations, that he was prejudiced, and that dismissal is warranted under CrR 8.3(b) on this basis. He argues that the witnesses' testimony would have established the circumstances about the insurance proceeds he received from his boat sinking, the status of his business and financial affairs at the time of the murders, Denise Hoerner's character, and that there are other suspects, namely Denise Hoerner, David Oberman, and Tim Robbins. We disagree that the State's mismanagement of the case directly caused the loss of information or unavailability of witnesses. Although Stenson claims that this missing testimony and evidence would have been potentially helpful for his defense, he fails to show actual prejudice such that the outcome of the trial would have been different. Thus, we hold that the trial court did not err in denying Stenson's motion to dismiss on this basis.

1. William Perry and David Oberman

Stenson argues that William Perry and David Oberman were unavailable for a second trial. William Perry would have testified about Stenson's financial affairs and business operations, but

---

[13] These witnesses either were deceased, could not remember, could not be located, or were unavailable for the second trial. Stenson argues that certain information was missing or not available, including the two applications for insurance proceeds Stenson made, Denise Hoerner's medical records, crime scene sketches, and a detective's interview notes dated March 25, 1993, of a neighbor who heard shots the morning of the murders. VRP (June 12, 2013) at 65. The insurance applications were available for trial. VRP (June 12, 2013) at 77. As to the remaining information, the State responded that Hoerner's medical records, crime scene sketches, and the detective notes were not favorable to the defense, that this information was not exculpatory evidence, and that the State was not required to provide this information to Stenson. VRP (June 12, 2013) at 80-81. Stenson fails to show that any of this information would have resulted in a different outcome at trial.

he could not be located. But Perry and Oberman testified at Stenson's first trial. Thus, transcripts of their trial testimony were available for use at the second trial. VRP (June 12, 2013) at 61, 78, 176, 202. Stenson's argument that these witnesses were unavailable fails.

2. Deanna Chapman

Stenson argues that Deanna Chapman was no longer available for trial due to her poor memory. She said previously that David Oberman told her that the murder weapon belonged to him but that the weapon had disappeared several weeks before the murders. VRP (June 12, 2013) at 63-64. There is no evidence that this hearsay evidence would have been admissible even if Deanna were able to testify.

3. Tracey Reed

Stenson argues that Tracey Reed, David Oberman's girlfriend, was unavailable. VRP (June 12, 2013) at 60. She would have allegedly testified to similar things as David and Barbara Oberman that Denise Hoerner abused her son, that she did not respect personal boundaries, and that she "was always trying to get back at somebody for something." CP at 2440. But Reed was not the State's witness, Reed was in the Seattle area, and a warrant had been issued for her at some point. VRP (June 12, 2013) at 78-79. The record is not clear whether Reed could have been located for trial and Reed's unavailability for trial cannot be attributed to the State.

4. Cheryl Fabel

Stenson argues that Cheryl Fabel, a friend of Denise Hoerner, had "damaging information" but was unavailable for a second trial. VRP (6/12/2013) at 62. Fabel would have allegedly testified that Denise Hoerner "[knew] how to use a gun, had affairs with other men before her husband died, had concerns about her pre-nupt[ial] agreement, was obsessed with money, [and]

planned to take the 'SOB' with everything." VRP (June 12, 2013) at 62-63. The State responds that Fabel was uncooperative, that Stenson could have deposed her[14] but had not done so, and that it was unclear whether her testimony at trial would be admissible. VRP (June 12, 2013) at 77-78. Stenson's argument fails.

5. Barbara & Philip Oberman, Becky & Jack Mendorff, and Carol Johnson

Stenson argues that several witnesses were deceased and thus were unavailable, including Barbara and Philip Oberman, Jack and Becky Mendorff, and Carol Johnson. These witnesses would have allegedly testified about Denise Hoerner's character, her relationships with her husband and Denise Stenson, and Denise Hoerner's activities on the day of and after the murders. David Oberman, the Hoerner's neighbor who had died, allegedly would have testified that Denise Hoerner and Hoerner had a troubled marriage, that Denise would "change her story and lie," that she physically abused her son and "thought it was funny," and that Denise Hoerner harassed him. CP at 2439. Stenson argues that this testimony would have "significantly" assisted him at trial. CP at 2473.

Barbara Oberman, Denise Stenson's mother, would have allegedly given testimony that Denise Hoerner had boundary issues, had broken into the Stenson home once, and that Denise Stenson indicated shortly before her murder that Denise Hoerner was not welcome.

Philip Oberman, Denise Stenson's father, would have allegedly testified that the Stensons had a good marriage, and that Denise Hoerner had been bothering Denise Stenson.

---

[14] The record is not clear why Stenson did not depose Fabel.

Jack Mendorff and his wife Becky Mendorff, the Stensons's neighbors, would have allegedly testified that Denise Hoerner arrived at their house early on the morning of the murders, contradicting Denise Hoerner's timeline and indicating that she had "some independent knowledge of the shootings."[15] CP at 2474. And Carol Johnson, the Stensons's former neighbor, would have also allegedly testified that the Stensons "got along well," which Stenson argues that her "testimony attesting to a positive relationship is helpful and important." CP at 2477. Stenson fails to show how these witnesses' unavailability materially affected his right to a fair trial such that the outcome of the trial would have been different. Thus, the trial court did not err in denying his motion to dismiss under CrR 8.3(b) on this basis.

6. Other Suspect Evidence

Finally, Stenson argues that a number of the unavailable witnesses could have provided testimony about other persons he asserts are possible suspects, Denise Hoerner, David Oberman, and Tim Robbins. Robbins was Denise Hoerner's attorney in another civil matter. Robbins's girlfriend was murdered in the summer of 1992, and Robbins allegedly made comments about killing someone and making it look like a suicide or killing someone with a gun to the head. Robbins later committed suicide. Stenson argues that Robbins's prior testimony is helpful to his defense. But there is no evidence linking Robbins to the murders in this case.

---

[15] Stenson alleges that Jack had said in an interview with the police that "Denise Hoerner appeared on his door step, clad only in [Hoerner's] robe, asking what happened to [Hoerner], where is [Hoerner], before she could have known about the murders had she not been involved in them. He is the only person who could testify to that and he's gone." VRP (6/12/2013) at 59.

Stenson fails to show how the other suspect evidence or testimony would have been admissible at trial. Nor does Stenson show that the outcome of the trial would have been different. Thus, we hold that the trial court did not abuse its discretion in denying Stenson's motion to dismiss on this basis.

### III. MOTION TO DISMISS BASED ON DUE PROCESS VIOLATION

Alternatively, Stenson argues that the trial court erred in denying his motion to dismiss based on a due process destruction of evidence theory.[16] He argues that the "federal test for destruction of evidence" under *Arizona v. Youngblood*[17] applies. Br. of Appellant at 63. But the testing related to the blood evidence was not materially exculpatory evidence but only potentially useful evidence. The State and the FBI attempted to preserve the blood evidence, and handled the blood evidence in the usual manner and followed proper protocols in testing the blood evidence. Absent bad faith by the State, which Stenson fails to show, we hold that the trial court did not abuse its discretion in denying the motion to dismiss based on a due process destruction of evidence theory.

To comply with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense. *See Brady*, 373 U.S. at 87-88 (the prosecution has a duty to disclose materially exculpatory evidence to the defendant); *California v. Trombetta*, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 81 L. Ed. 413 (1984) (the prosecution has a duty to preserve materially exculpatory evidence). However, there

---

[16] Our Supreme Court already addressed the *Brady* violation when it ordered a second trial. *In Re Stenson,* 174 Wn.2d at 494. We do not address that issue further.
[17] 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

is not an unqualified duty to "retain and to preserve all material that might be of conceivable evidentiary significance." *Youngblood*, 488 U.S. at 58.

Our Supreme Court adopted the *Youngblood* standard for destruction of evidence in *State v. Wittenbarger*, 124 Wn.2d 467, 880 P.2d 517 (1994). "A showing that the evidence might have exonerated the defendant is not enough," the evidence must be "'material[ly] exculpatory evidence.'" *Wittenbarger*, 124 Wn.2d at 475 (quoting *Trombetta*, 467 U.S. at 489). To be "materially exculpatory evidence," the evidence must (1) have "exculpatory value that was apparent before it was destroyed" and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Wittenbarger*, 124 Wn.2d at 475 (citing *Trombetta*, 467 U.S. at 489).

Due process is not violated by the State's failure to preserve "potentially useful" evidence unless the defendant can prove bad faith by the State. *Wittenbarger*, 124 Wn.2d at 477 (citing *Youngblood*, 488 U.S. at 58). When the State performs one test that interferes with the ability to conduct a subsequent test, absent bad faith, there is no due process violation. *See State v. Lord*, 117 Wn.2d 829, 867-68, 822 P.2d 177 (1991) (citing *Youngblood,* 488 U.S. at 57-58).

Stenson fails to demonstrate that the bloodstain evidence on the pants was materially exculpatory. His own expert's qualified opinion mirrored that of the State's expert–that the blood was deposited on the right leg of the pants from either dripped blood or contact transfer. Although Stenson's expert said it would be best if he could have additional testing of the bloodstain evidence on the pants, it is not clear that the cuttings from the pants were "materially exculpatory" at the time the cuttings were taken; thus, the cuttings were only "potentially useful" evidence. Further, the photographs show that the bloodstain evidence and the pattern of the bloodstains on the pants

(referred to as the halo rings) still had some level of bloodstain deposits remaining; thus, it is not clear that the evidence Stenson seeks was only available through the cuttings consumed during the DNA testing. *Trombetta*, 467 U.S. at 489.

Stenson also fails to show bad faith by the State. VRP (6/12/2013) at 93-94. The evidence was not lost until after Stenson's first trial and direct appeal had concluded. Further, the FBI attempted to preserve the bloodstain evidence and its pattern by photographing the intact pants before making the cuttings required for the DNA analysis. CP at 992-93. Stenson does not argue that the State and FBI failed to handle the blood evidence "in its usual manner" or that they failed to follow the standard protocols used in 1993 and 1994. *See State v. Ortiz*, 119 Wn.2d 294, 302, 831 P.2d 1060 (1992) (holding that the trial court did not abuse its discretion denying defendant's motion to dismiss when it found that the State acted "reasonably and in good faith").

Thus, because the bloodstain evidence was not materially exculpatory, but only potentially useful evidence, and the State did not act in bad faith in conducting DNA testing on the bloodstain evidence on the pants, the trial court did not abuse its discretion when it denied Stenson's motion to dismiss based on a due process destruction of evidence theory.[18]

IV. MOTION TO SUPPRESS THE PANTS BASED ON DUE PROCESS VIOLATION

Stenson argues that due process requires the suppression of the pants as evidence. We hold that Stenson cannot show a due process violation because he cannot show that the State acted in

---

[18] Stenson argues that there is an "independent due process test" for destruction of evidence derived in the Washington Constitution. Br. of Appellant at 66-67. However, our Supreme Court expressly rejected this argument in *Wittenbarger*. 124 Wn.2d at 496 (holding that the state due process clause affords the same protection as its federal counterpart regarding a defendant's right to potentially exculpatory evidence and the State's duty to preserve such evidence).

bad faith in handling the pants. Thus, we hold that the trial court did not err in denying his motion to suppress the pants.

Suppression of evidence is an appropriate *alternative sanction* to a CrR 8.3(b) motion to dismiss. *See State v. Marks*, 114 Wn.2d 724, 730, 790 P.2d 138 (1990) ("Dismissal is unwarranted in cases where suppression of evidence may eliminate whatever prejudice is caused by governmental misconduct."). Suppression of evidence is also an appropriate sanction available to the trial court when confronted with the destruction of evidence, if suppression will be effective to assure the defendant a fair trial. *See State v. Boyd*, 29 Wn. App. 584, 590, 629 P.2d 930 (1981). But the defendant must still show that the destroyed evidence is (1) "materially exculpatory" or (2) that the State destroyed the evidence in bad faith. *See Youngblood*, 488 U.S. at 57-58; *Wittenbarger,* 124 Wn.2d at 477.

However, as analyzed above, Stenson has failed to show that the State acted in bad faith. In denying Stenson's motion to dismiss, the trial court explained there has been "full disclosure of all the information [about the pants]" and that Stenson could challenge the credibility and reliability of the pants as evidence at trial. VRP at 136. The trial court further stated,

> [I]t is the [c]ourt's opinion that the arguments, the challenges, the issues that the Defense has with the pants do not prohibit or preclude its admissibility as evidence. They do go to the weight of the evidence, and obviously what I just read is a script for what the Defense is now able to do on a retrial.
>
> The new evidence that has been disclosed basically means that the approach taken by the Defense in terms of dealing with this critical piece of evidence offered by the State will be vastly expanded and very different.

VRP at 137.

There was no evidence of actual contamination of the blood evidence on the pants; there were only opportunities for contamination that Stenson could point out in trial. Stenson has failed to show bad faith by the State in its handling of the pants. Thus, we hold that the trial court did not err when it denied Stenson's motion to suppress.

## V.  SPOLIATION INSTRUCTION

Stenson argues that the trial court erred when it refused to give a spoliation instruction related to the destruction of the bloodstain evidence on the pants. We hold that the trial court did not abuse its discretion in denying Stenson's requested spoliation instruction.

We review a trial court's refusal to give a requested jury instruction on spoliation for an abuse of discretion. *See State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. *State v. Reed*, 168 Wn. App. 553, 571, 278 P.3d 203 (2012).

Jury instructions are sufficient when they are supported by substantial evidence, allow the parties to argue their theories of the case, and properly inform the jury of the applicable law. *State v. Soper*, 135 Wn. App. 89, 101, 143 P.3d 335 (2006). It is prejudicial error to give an instruction to the jury that is not supported by the evidence. *Soper*, 135 Wn. App. at 101.

In determining whether to give a requested spoliation jury instruction, we review the potential importance or relevance of the missing evidence and the culpability or fault of the adverse party. *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 135, 307 P.3d 811 (2013). As for culpability, we examine whether the adverse party acted in bad faith or conscious disregard of the importance of the evidence, or whether there was some innocent explanation for the destruction. *Henderson v Tyrrell*, 80 Wn. App. 592, 609, 910 P.2d 522 (1996).

33

Stenson's requested spoliation instruction pertained solely to the cut out portions of the pants evidence that contained the bloodstains. CP at 380. During trial, six witnesses testified that the cutouts were made for the purposes of DNA testing. At least three different DNA tests were performed on the cuttings in 1993-94 and 2008-09 during which the cuttings were completely consumed or disposed of after testing. *See* CP at 1053-55 (Genelex DNA Testing Report 1994); CP at 1063-64, 1066-68 (WSP Crime Lab Report 2009); CP at 1070 (Marysville Crime Lab Report 2009).

The facts here do not support a spoliation instruction because the State sufficiently explained that the destruction of the bloodstain evidence resulted from DNA testing. Thus, we hold that the trial court did not abuse its discretion when it denied Stenson's requested spoliation instruction.

## VI. MOTIONS FOR MISTRIAL

Stenson argues that the trial court erred when it failed to grant his motions for mistrial after Denise Hoerner remarked that Stenson killed her husband and after she whispered liar, liar, liar in front of the jury. We disagree.

### A. LEGAL PRINCIPLES

We review a trial court's decision to deny a motion for mistrial for an abuse of discretion. *State v. Perez-Valdez*, 172 Wn.2d 808, 819, 265 P.3d 853 (2011). We will find an abuse of discretion "'only when no reasonable judge would have reached the same conclusion.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997)). A trial court should grant a mistrial "'only when the defendant has been so prejudiced that nothing short of a new trial can

insure that the defendant will be tried fairly.'" *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (internal quotation marks omitted) (quoting *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).

Under CrR 7.5(a)(5), a trial court may grant a motion for a mistrial "when it affirmatively appears that a substantial right of the defendant was materially affected" by an irregularity in the proceedings that prevented the defendant from having a fair trial. When a trial irregularity occurs, to determine its effect, we examine "'(1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it.'" *State v. Gamble*, 168 Wn.2d 161, 177, 255 P.3d 973 (2010) (internal quotation marks omitted) (quoting *Hopson*, 113 Wn.2d at 284).

A trial court has wide discretion to cure a trial irregularity resulting from improper witness statements. *Gamble*, 168 Wn.2d at 177. "In some cases[,] curative instructions have been held insufficient to remove prejudicial effect." *Gamble*, 168 Wn.2d at 177 (citing *Hopson*, 113 Wn.2d at 284-85). We must decide whether, "when viewed against the [entire] backdrop of all the evidence," the improper testimony denied the defendant of a fair trial. *State v. Allen*, 159 Wn.2d 1, 10, 147 P.3d 581 (2006). Further, we presume that juries follow the court's instructions, absent evidence to the contrary. *State v. Montgomery*, 163 Wn.2d 577, 596, 183 P.3d 267 (2008).

B. DENISE HOERNER'S REMARK THAT STENSON KILLED FRANK

In response to a question from the prosecutor about Hoerner's adoption of her son, Denise Hoerner responded,

Um, we got the name changed and everything and afterwards we saw—we saw a lawyer prior to [Stenson] killing Frank.

VRP at 1288. Stenson objected to her remark that Stenson killed Frank, and the trial court immediately struck the remark and instructed the jury to disregard the remark.

During the break, Stenson made his first motion for a mistrial based on Denise Hoerner's remark. The trial court denied the mistrial motion because any potential prejudice was cured by his instruction to the jury to disregard the comment, which the trial court "expect[ed] the jury to follow." VRP at 1313.

In considering the impact of Denise Hoerner's remark, the trial court noted that Denise Hoerner hyperventilated, sobbed, cried, and had a hard time testifying. The trial court commented that the jury would not be surprised that the witness thought that Stenson killed her husband, but indicated that it believed the jury would follow the court's instruction to disregard her remark. Her single remark, given in the context in which she made it, is not serious enough to warrant a mistrial. By immediately striking the remark and instructing the jury to disregard the remark, the trial court cured any potential prejudice. Further, because Denise Hoerner did not repeat the remark, the remark was not cumulative. We hold that Stenson was not denied the right to a fair trial as a result of Denise Hoerner's improper remark. Thus, the trial court did not abuse its discretion in denying Stenson's motion for mistrial.

C. "LIAR, LIAR, LIAR"

Stenson also argues that the trial court erred in denying his second motion for a mistrial based on Denise Hoerner's comments to the jury when she whispered, "[L]iar, liar, liar." We disagree.

We review a motion for a mistrial to determine "'(1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it.'"

36

*Gamble*, 168 Wn.2d at 177 (internal quotation marks omitted) (quoting *Hopson*, 113 Wn.2d at 284).

After Denise Hoerner completed her testimony, Stenson moved for a mistrial alleging that Denise Hoerner whispered, "[L]iar, liar, liar" to the jury during her cross-examination. VRP at 1523. The trial court asked the court reporter to review the record, but nothing was found in the record that Denise Hoerner said liar, liar, liar. The trial judge noted that he and the court reporter were the two individuals sitting closest to the witness stand, and that neither of them heard this comment during her testimony.

The trial court asked the jurors whether anyone heard Denise Hoerner make "a comment directed to one or more of the jurors other than an answer to a question." VRP at 1529. Five jurors stated that they heard Denise Hoerner make a comment directed at the jury. The trial court then questioned each juror individually. All said that they were still able to be fair and impartial, and that Denise Hoerner's comments would not affect their verdict.

After hearing the jurors' responses, the trial court denied Stenson's second mistrial motion, noting that the jury was

> incredibly attentive and all of them realized that what was happening was not
> appropriate and did their very best to ignore it. I accept their answers that it did not
> and will not impact their ability to be fair and impartial as jurors.

VRP at 1540.

The trial court properly evaluated whether the remarks impacted the jury. By questioning each juror as to whether the juror could be fair and impartial, the trial court properly concluded that the remarks were not so serious or cumulative that the jury could not disregard them as instructed. We hold that Stenson was not denied a fair trial based on Denise Hoerner's improper

remarks. Thus, we hold that the trial court did not abuse its discretion when it denied Stenson's motion for mistrial.

## VII. PRIOR DRUG CONVICTION EVIDENCE-ER 609

Stenson argues that the trial court erred when it admitted evidence of Wagner's prior drug convictions for impeachment purposes under ER 609. We disagree.

We review a trial court's ruling under ER 609 for an abuse of discretion. *State v. Garcia*, 179 Wn.2d 828, 846, 318 P.3d 266 (2014). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). The burden is on the appellant to prove that the trial court abused its discretion. *State v. Asaeli*, 150 Wn. App. 543, 573, 208 P.3d 1136 (2009). Under the abuse of discretion standard, we will not disturb a trial court's decision to admit a prior conviction for impeachment purposes absent a clear showing of abuse. *State v. King*, 75 Wn. App. 899, 910 n.5, 878 P.2d 466 (1994).

Under ER 609(a)(1), evidence of a witness's prior felony convictions may be admissible for the purpose of attacking the witness's credibility. But the trial court must also determine "that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered."

"Prior convictions are . . . only 'probative' under ER 609(a)(1) to the extent they are probative of the witness's truthfulness." *State v. Hardy*, 133 Wn.2d 701, 707-08, 946 P.2d 1175 (1997). Prior drug convictions, in general, are not probative of a witness's credibility under ER 609(a)(1). *Hardy*, 133 Wn.2d at 709-10. For a prior conviction to be admitted under ER 609(a)(1), the party seeking admission of the evidence must affirmatively demonstrate that "(1) the prior

conviction bears on the witness's veracity and (2) the probative value outweighs the prejudice." *Hardy*, 133 Wn.2d at 711-12 (citing *State v. Jones*, 101 Wn.2d 113, 120, 677 P.2d 131 (1984)).

The trial court must conduct an analysis balancing the probative value against the prejudicial effect to the defendant on the record. *State v. Bankston*, 99 Wn. App. 266, 270-71, 992 P.2d 1041 (2000). Before admitting a prior conviction as impeachment evidence against a *defendant* witness who testifies, the trial court must also balance the following factors:

> (1) the length of the defendant's criminal record; (2) the remoteness of the prior conviction; (3) the nature of the prior crime; (4) the age and circumstances of the defendant; (5) the centrality of the credibility issue; and (6) the impeachment value of the prior conviction.

*State v. Calegar*, 133 Wn.2d 718, 722, 947 P.2d 235 (1997) (citing *State v. Alexis*, 95 Wn.2d 15, 19, 621 P.2d 1269 (1980)).

The defense's theory of the case focused on Denise Hoerner as the other suspect who actually murdered her husband and Denise Stenson. Wagner was friends with Denise Hoerner in 1993, and testified that Hoerner's marriage was struggling, that Denise was angry over finances, and that Denise would be better off financially if Hoerner died. Wagner stated that Denise Hoerner did not seem to miss or mourn Hoerner after he died, spoke poorly about him, and started dating shortly after Hoerner's death. Wagner also testified that Denise spent money "like it was water" after Hoerner died, and speculated about her purchases and motives behind her purchases, "buying [things] just to be buying them." VRP at 3024.

During cross-examination, Wagner admitted that she had a falling out with Denise Hoerner in 2008, and that she was not very familiar with Darold or Denise Stenson. The State then moved to introduce evidence of Wagner's prior drug convictions to impeach her credibility as a witness.

Wagner had 10 prior felony drug convictions. The State argued that this evidence would impeach Wagner who seemed "unusually eager to . . . slander Ms. Hoerner," that her answers went beyond the scope of the questions asked, and because she volunteered her opinions and speculated about Denise Hoerner's spending habits. VRP at 3028.

After hearing arguments from both parties, the trial court balanced the probative value of the impeachment evidence against the potential prejudice to Stenson, and admitted the prior convictions to impeach Wagner, stating, "[U]nder 609(a), I think it is proper impeachment." VRP at 3030. The trial court's ruling was not manifestly unreasonable or untenable, and Stenson fails to meet his burden. Thus, we hold that the trial court did not abuse its discretion in admitting Wagner's prior drug convictions to impeach her credibility as a witness under ER 609(a)(1).

## VIII. REASONABLE DOUBT INSTRUCTION

Stenson challenges the definition of reasonable doubt in instruction no. 5, which is identical to 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008) (WPIC). Stenson specifically challenges the instruction's language defining reasonable doubt, "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." Br. of Appellant at 117 (citing CP 289). Stenson argues that WPIC 4.01's reasonable doubt definition is analogous to a prosecutor's "fill-in-the-blank" arguments which are barred because they imply "that the jury must be able to articulate its reasonable doubt by filling in the blank," and impermissibly shift the burden of proof to the defendant. *See State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

We review challenged jury instructions de novo, in the context of the instructions as a whole. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). The law is well settled that

40

the court's reasonable doubt instruction, which is identical to the WPIC, is a correct statement of the law. *State v. Parnel*, Wn. App. 325, 328, 381 P.3d 128, *review denied*, No. 46995-2, 2016 WL 7166598 (Aug. 2, 2016). Thus, the trial court did not error in instructing the jury on reasonable doubt.

## IX. PROSECUTORIAL MISCONDUCT

Stenson argues that the prosecutor committed misconduct when, during closing argument, she quantified its burden of proof by using a puzzle analogy.[19] We disagree.

A defendant has a constitutional right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington State Constitution. *In re Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). Prosecutorial misconduct may deprive a criminal defendant of a fair trial. *Glasmann*, 175 Wn.2d at 703-04. Arguments that shift or misstate the burden of proof from the State to the defendant constitute misconduct. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014).

In a claim of prosecutorial misconduct, the defendant bears the burden to prove that the prosecutor's remarks were both improper and prejudicial. *Emery*, 174 Wn.2d at 756. If the

---

[19] The prosecutor argued during closing:

> Here, the evidence is here. The pieces are here. At the end you may conclude that you're missing a few pieces, that you have pieces that are gone. But I submit to you, you may have questions, but I submit to you that after full, fair and careful consideration of the facts of the evidence, of the lack of evidence, you're still going to be able to see the picture of what happened to Frank Hoerner and Denise Stenson on March 25, 1993. You will be convinced, you will have an abiding belief in the truth of the charge, that the Defendant killed them.

VRP at 4172.

defendant fails to object at trial, the defendant waives any error unless the prosecutor's remarks were so flagrant and ill-intentioned that no instruction could have cured any prejudice. *Emery*, 174 Wn.2d at 760-61. Thus,

> [T]he defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict."

*Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). "In analyzing prejudice, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Here, Stenson failed to object to the prosecutor's puzzle analogy statement in closing. Even assuming that the puzzle analogy statement was improper, if counsel had objected, the trial court could have given a curative instruction to remedy any possible prejudice. The prosecutor's statement was not so flagrant or ill-intentioned that a curative instruction would not have remedied any possible prejudice. We hold that Stenson's claim of prosecutorial misconduct fails.

## X. CUMULATIVE ERROR

Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors results in a trial that is fundamentally unfair. *Emery*, 174 Wn.2d at 766. Stenson asserts that the cumulative effect of any two or more of the alleged errors at trial warrant a reversal of his convictions. Because Stenson's challenges fail, he is not entitled to a new trial under the cumulative error doctrine.

CONCLUSION

We affirm Stenson's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, P.J.

MELNICK, J.